ROSE BRAJE *et al.*, Appellants, v. BOARD OF FIRE AND POLICE COMMISSIONERS OF THE CITY OF HICKORY HILLS *et al.*, Appellees.

First District (2nd Division)   No. 84—2853

Opinion filed December 10, 1985.—Rehearing denied January 14, 1986.

Stanley H. Jakala, of Berwyn, and Blair I. Braverman, of Oak Lawn, for appellants.

Burton S. Odelson and Mark H. Sterk, both of Burton S. Odelson & Associates, Ltd., of Evergreen Park, for appellees.

JUSTICE BILANDIC delivered the opinion of the court:

Plaintiff-appellant Rose Braje was dismissed from her position as a police officer for the city of Hickory Hills by defendants board of fire and police commissioner, Thomas Burdelle, Richard Bujwit and Fred Carbonara (collectively, the board). Plaintiff-appellant James Alexander was suspended for 30 days by defendant Board. Defendant Peter Hurst, Chief of Police, brought the charges against them. Both were charged with violations of certain rules and regulations of the Hickory Hills police department. The violations included unnecessary shouting; using obscene language; engaging in conduct that adversely affected the morals of the department; failing to cooperate with an internal police investigation; giving false information regarding possession of a firearm; and sleeping on duty.

Plaintiffs filed a complaint for administrative review in the circuit court, which affirmed the board's findings. Plaintiffs appeal. The only issue presented is whether there was sufficient evidence to support the board's decision.

The significant incidents involved in this case occurred in 1982. At that time, Rose Braje was 26 years old and a member of the Hickory Hills police department since 1978. James Alexander was 34 years old and a member of the same police department since 1976. He was married to Olga Alexander. They had three children ranging in age from three to ten years. A report prepared by Sergeant George Dulzo

shows that Braje and Alexander became lovers while both were on the force. This became known to Olga Alexander and members of the police department. During the fall of 1980, Sergeant Dulzo first became aware of the plaintiffs' relationship, and he also noticed that they would meet an "unusual number of times during a shift." Dulzo advised plaintiffs to avoid such meetings because their relationship was becoming public knowledge.

Plaintiffs, however, continued to meet during duty. Alexander began to show signs of stress because of his deteriorating domestic situation. Olga also began calling the police department and asking about the hours her husband supposedly was working. The police department responded by changing plaintiffs' schedules so that they would have less occasion to meet.

In early 1982, plaintiffs were often tardy for work. In fact, Braje received a one-day suspension after she had to be awakened by the department so that she could report to work. Also, during this time, Alexander and Olga separated, and Alexander moved in with Braje. According to Dulzo, Braje was asked to leave both her duty and off-duty revolvers with the department "[b]ecause of the deteriorating domestic situation at Alexander's home." Braje kept stalling and making various excuses but did not comply with this department request, although this request was intended for her benefit and the best interests of the police department.

Sergeant Dulzo testified that he was the watch commander on the midnight shift on August 21, 1982. Braje was assigned to patrol duty in a squad car. At approximately 3 a.m., attempts to reach Braje by radio failed, so Dulzo drove around until 3:45 a.m. He found Braje in her squad car, which was parked with the lights off approximately 125 feet from the road in the driveway of a deserted farm. As he approached her squad car, which was facing his car, he turned on his bright lights. Then he drove alongside Braje's squad and observed her behind the steering wheel with her head leaning back on the headrest, mouth open and eyes closed. He focused his spotlight on her face from a distance of about three feet without any response from her. He sounded his car horn several times; Braje's position remained unchanged. Finally, Sergeant Dulzo left his squad car and pounded on the hood of Braje's car. She woke up, rolled down her window and said "hello."

Officer Braje, in contrast, testified that she was suffering from a severe headache. This caused her to pull off the road, turn down her two-way radios and place her head in her hands. Sergeant Dulzo pulled up and knocked on her window. She looked up and said

"hello."

On the night of October 2, 1982, plaintiffs were involved in a public disturbance at a restaurant. The incident involved plaintiffs, who were off duty, and Alexander's estranged wife. The accounts of the witnesses are contradictory, but it is clear that all three parties exchanged unpleasantries and vulgarities in the lounge, the vestibule, and the parking lot. Plaintiffs claim that Olga Alexander started screaming at them when they walked in; Olga claims that Alexander was angry at her and began yelling about her alleged neglect of their children. Olga also stated that Braje raised her fist and swung at her. Regardless of who started the incident, it is clear that there was a public disturbance. Alexander called Officer Vodicker to the scene, and he demanded that a report, charging Olga with child neglect, be made out. Olga later filed disorderly conduct charges, but the charges were dropped.

From early 1982, although Braje was requested to leave her service revolver and off-duty revolver at the station, she pursued a course of delaying actions, particularly regarding her off-duty weapon. This was a snub-nose Colt .38-caliber revolver that she had purchased through the department.

On October 4, 1982, plaintiffs were reassigned to foot patrol because they were the objects of a police and grand jury investigation that is not related to this case. Three days later, on October 7, 1982, Sergeant Lawrence Barre, pursuant to an administrative order from Police Chief Peter Hurst, ordered Braje to turn in both of her handguns. Braje replied that she would turn in her service revolver but that she no longer had her off-duty revolver. When asked of its whereabouts, she replied that her father had lost it, although later she said that she sold it. The next day, Chief Hurst submitted written questions to her concerning the gun. Braje answered that she did not sell the gun and that she had given the gun to her father in January 1982.

On November 1, 1982, Braje and Alexander were ordered to appear for an internal police interview to be conducted by an attorney hired by the city. The interview was set for November 9, 1982. The order advised the police officers that they could have an attorney present and that they could exercise their privilege against self-incrimination. On November 2, 1982, counsel for the police officers responded in writing that the officers would appear on November 9, but would not submit to any questioning. On November 5, 1982, the same attorney for Braje and Alexander requested in writing that the interview be postponed from November 9 to any date after Thanksgiving.

The letter further stated:

"For your information, my client [sic] intend to assert their Fifth Amendment rights to each and every question posed by Mr. Hurst or yourself."

On November 22, 1982, Hurst sent plaintiffs another administrative order rescheduling the interview for November 26, 1982. This was one day after Thanksgiving. The order read, in part: "As a courtesy, you may have an attorney present at this interview." The order stated further that plaintiffs had all of the due process rights guaranteed under the constitution, "including the right not to be compelled to incriminate yourself. However, if you refuse to testify or to answer questions relating to the performance of your official duties or fitness for duty, you will be subject to departmental charges which could result in your dismissal. If you do answer, neither your statements nor any information or evidence *** can be used against you in any subsequent criminal proceeding. However, these statements may be used against you in relation to any subsequent departmental charges or disciplinary proceeding."

On November 22, 1982, counsel for Braje and Alexander replied that he was not well and could not attend the November 26 interview and requested that his home be used for the questioning. The request was rejected, and the interrogation proceeded as scheduled. Although their attorney was not present, Braje and Alexander followed his advice and refused to answer any questions. On December 7, 1982, Chief Hurst placed charges against Braje and Alexander before the defendant board, which informed plaintiffs of the date on which a hearing would be held and of their right to counsel.

The principal assignment of error raised by plaintiffs is that the decision of the board was against the manifest weight of the evidence. However, the evidence of their joint conduct shows that they neglected their duty through their personal conduct toward each other during working hours and while off duty. The evidence supports the conclusion that their relationship interfered with the performance of their assigned duties and had an adverse internal and external effect on the police department.

Their off-duty conduct, as evidenced by the meeting with Alexander's estranged wife at a restaurant in October 1982, was unbecoming of police officers and adversely affected the public image of the department.

The record reveals a tolerance by their superiors, who made efforts, by appropriate suggestions, to direct Braje and Alexander to be discreet. Plaintiffs rebuffed these efforts and continued their defiant

and insubordinate behavior. Their superiors had to resort to issuing administrative orders. When plaintiffs refused to cooperate, the only course left was to institute these disciplinary proceedings.

Plaintiffs seek to justify their conduct in the restaurant incident by claiming that their words are protected by the first amendment and that they should not be sanctioned because they were off duty when the incident occurred. The defenses are unavailing, however, because obscenity does not receive protection under the first amendment. (*Miller v. California* (1973), 413 U.S. 15, 23, 37 L. Ed. 2d 419, 430, 93 S. Ct. 2607, 2614.) Assuming, *arguendo*, that the speech was not obscene, then the general rule is that a police officer "may exercise his right to free speech as long as he does not impair the administration of the public service in which he is engaged. [Citations.] Thus, where it is sought to discipline a police officer for exercising his right to free speech, the public interest and the individual interest of the employee must be balanced against the interest of the department or employer." (*Schafer v. Board of Fire & Police Commissioners* (1979), 69 Ill. App. 3d 677, 680, 387 N.E.2d 976.) Here, balancing the interests tips the scales in favor of the public interest to have police officers who act to preserve the peace, not to disturb it. The board, as the trier of fact, was in the best position to weigh the evidence and the credibility of the witnesses, and there is sufficient evidence to support its finding that plaintiffs violated departmental rules.

The record also supports the board's findings that plaintiffs acted in a manner that adversely affected the morals and the efficiency of the department. Plaintiffs' relationship was the cause of many of the complaints against them—their tardiness, sleeping, and public disturbance. Their conduct falls squarely within Rule 35, which prohibits conduct that "adversely affects the morals or efficiency of the Department, or *** has a tendency to destroy public respect for the employee or the Department or destroy confidence in the operation of the municipal service." Hickory Hills, Ill., Police Department Rules, art. VI, sec. B (1982).

Generally, the weight to be given evidence and the credibility of the witnesses are within the province of the administrative body hearing the cause. (*Jackson v. Board of Regents* (1985), 105 Ill. 2d 501, 513, 475 N.E.2d 879.) The courts will not interfere with the discretionary authority vested in an administrative body unless either its authority is exercised in an arbitrary or capricious manner or its administrative order is against the manifest weight of the evidence. (*Cotovsky v. Department of Registration & Education* (1982), 110 Ill.

App. 3d 417, 424, 442 N.E.2d 520.) Here, the decision of the board is not so unreasonable or arbitrary that a reversal is required.

Plaintiffs claim that the board's finding that they failed to cooperate with an internal investigation is against the manifest weight of the evidence. The record reveals that commencing in 1980, while relatively new police officers, plaintiffs engaged in a continuous course of conduct that became progressively worse and culminated in the disciplinary proceedings under review. The constructive suggestions of their superiors were not well received. In fact, kindness seemed to create an attitude of defiance and, ultimately, insubordination. Their neglect of duty, tardiness, conduct that was unbecoming and adversely affected the moral and public image of the department, refusal to obey orders and, in Braje's case, sleeping on duty and flagrant defiance of the orders that she leave her handguns at the police station, for her own good and the good of the department, created an intolerable situation.

■ Plaintiffs seek to justify this conduct and obtain a reversal on the grounds that they did not have counsel present at the interview on November 26, 1982. The interview was first scheduled for November 9, 1982. They were advised in writing of their rights and that they were permitted to have counsel present. In fact, on November 5, their attorney responded that both plaintiffs would "assert their Fifth Amendment rights to each and every question." The interview was postponed at the request of the plaintiffs. Then it was rescheduled at the request of their attorney. Once again they were advised of their rights. On the date of the interview, counsel claimed he was unable to attend. The record shows that during the disciplinary hearings, three attorneys out of a four-person firm attended, yet none appeared for the interview. However, plaintiffs did exactly what their attorney advised and refused to answer any questions. The failure of counsel to attend, under the facts of this case, cannot be seriously urged as a basis for reversal. Whether and how long a respondent may delay a disciplinary proceeding in order to secure the presence of counsel is primarily within the discretion of the administrative body hearing the cause. See, *e.g., Kammerer v. Board of Fire & Police Commissioners* (1970), 44 Ill. 2d 500, 504, 256 N.E.2d 12.

■ Plaintiffs also contend that they should have been advised in writing of the subject matter of the interview. There is no reason to doubt that the purpose of the interview was obvious. Plaintiffs cite *Placek v. City of Chicago Heights* (1979), 74 Ill. App. 3d 702, 393 N.E.2d 1218, in support of their contention. *Placek* is clearly distinguishable. In *Placek*, a police officer was the subject of a criminal fel-

ony investigation. When questioned by hi superior he confessed. Later, he reduced his confession to writing. The police officer never received any oral or written admonition about the subject matter of his interrogation or his constitutional rights. The confession was used at later disciplinary proceedings that resulted in the officer's discharge from the department. The violation of constitutional rights is evident in such a situation. In the case at bar, the police officers received more than adequate constitutional admonitions. Due to their uncooperative, insolent and insubordinate conduct over a two-year period, they knew or certainly should have known the subject matter of their interview. Our supreme court has ruled that "if a public employee refuses to testify as to a matter concerning which his employer is entitled to inquire, he may be discharged for insubordination, but if he does testify his answers may not be used against him in a subsequent criminal prosecution." (*Kammerer v. Board of Fire & Police Commissioners* (1970), 44 Ill. 2d 500, 506, 256 N.E.2d 12.) Thus, plaintiffs' due process rights were not violated.

We note in passing that since the date of the occurrences alleged in this case and since *Placek* was decided, the General Assembly enacted the Uniform Peace Officers' Disciplinary Act (Ill. Ann. Stat., ch. 85, par. 2551 *et seq.* (Smith-Hurd 1985 Supp.)), which has codified the procedures concerning informal inquiries, formal investigations, and interrogations.

In addition to matters involving the joint conduct of Braje and Alexander, we now consider the additional charges which deal solely with the conduct of Braje. She was charged with sleeping on the job and giving false answers about her off-duty revolver.

As noted, Braje was found asleep in her squad car by Sergeant Dulzo on August 21, 1982. She had parked her car away from the road on a farm's driveway. She did not respond to her radio, and another squad car had to be dispatched so that Braje could be located. Only after Sergeant Dulzo pounded on the hood of her car did Braje awaken from her slumber. Sleeping while on duty is a sufficient cause for dismissal. *Petraitis v. Board of Fire & Police Commissioners* (1975), 31 Ill. App. 3d 864, 867-68, 335 N.E.2d 126.

The board also found that Braje violated departmental rules by giving false answers concerning the whereabouts of her off-duty revolver. The evidence is clear that Braje changed her story several times. She said at various times that the gun was lost; then she said that she sold it. The gun was either in her father's possession or her possession. Besides giving patently false answers, Braje never complied with Chief Hurst's orders to turn in the gun, which in itself is

sufficient cause for dismissal.

■ Under the Administrative Review Act (Ill. Rev. Stat. 1983, ch. 110, par. 3—101 *et seq.*), the findings and conclusions of the agency on question of fact are *prima facie* true and correct (Ill. Rev. Stat. 1983, ch. 110, par. 3—110). A reviewing court can only set aside the findings if they are against the manifest weight of the evidence. (*Profice v. Board of Review* (1985), 135 Ill. App. 3d 254, 257, 481 N.E.2d 1229.) Where it appears that there is evidence to support the findings of the administrative agency, its decision should be affirmed. 135 Ill. App. 3d 254, 257.

Under this test, the board's findings were not against the manifest weight of the evidence. The record supports both Braje's dismissal for cause and Alexander's suspension.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

STAMOS, P.J., and HARTMAN, J., concur.