CLIFFORD LAUNIUS, Plaintiff-Appellant, v. THE BOARD OF FIRE AND
POLICE COMMISSIONERS OF THE CITY OF DES PLAINES *et al.*,
Defendants-Appellees.

First District (1st Division)   No. 1—89—2577

Opinion filed March 18, 1991.—Rehearing denied May 8, 1991.

CAMPBELL, J., dissenting.

Stanley H. Jakala, of Berwyn, for appellant.

Richard A. Marten, of Chicago, for appellees Board of Fire and Police Commissioners of the City of Des Plaines, A.C. Wilson, Herman Herzog, and William J. Connolly.

Klein, Thorpe & Jenkin, Ltd., of Chicago (Patrick A. Lucansky, of counsel), for appellee Joseph Kozenczak.

JUSTICE BUCKLEY delivered the opinion of the court:

This action on administrative review arises from charges brought by defendant Joseph Kozenczak, chief of police of the City of Des Plaines, against Clifford Launius (plaintiff), a police officer of the Des

Plaines police department (the department), for his conduct in leaving his assigned post on August 14, 1987. Following a hearing before defendant the Board of Fire and Police Commissioners of the City of Des Plaines (the Board), the Board found that plaintiff had violated various department rules and regulations and discharged plaintiff from service. On appeal from the circuit court's order affirming the Board's decision, plaintiff contends that he did not receive a fair and impartial hearing before the Board, that the Board's findings are against the manifest weight of the evidence, and that the sanction of discharge is arbitrary, capricious and unreasonable.

In the early morning hours of August 14, 1987, plaintiff left his wife and two children, ages eight months and five years, at their townhouse in Wheeling, Illinois, and drove to the police station to begin the 7 a.m. to 3 p.m. second watch. He was aware en route to the station that an excessive amount of rain had fallen overnight and that a number of roadways were impassible due to standing water. On his 6:45 a.m. arrival, plaintiff was assigned to the complaint desk and switchboard, where he was required to transfer to the dispatcher telephone calls from citizens requesting information and assistance.

Between 7:30 and 7:45 a.m., officers assigned to the desk and those on the street were advised of the implementation of the city's emergency traffic plan, which requires traffic accident victims to report accidents at the police station. At 8:25 a.m., the mayor ordered the chief of police to the emergency command center, a coordinating center for department heads.

At approximately 7:30 a.m., plaintiff, upon noticing the heavy rainfall, telephoned his wife and requested that she check their basement for water. His wife reported no water in the basement, but stated that the lake across the street had overflowed its banks and flooded the street. Between 8 a.m. and 8:15 a.m., plaintiff's wife telephoned plaintiff to inform him that water was at that time seeping into the basement and that the lake's overflow had progressed to the front lawn and garage. Plaintiff again contacted his wife between 9 a.m. and 9:10 a.m., at which time his wife excitedly reported the continuance of the spread of water toward the house and the continuance of water accumulation in the basement.

Plaintiff then informed Lieutenant Ronald K. Diehl that flooding was becoming a problem at his home and that, as a result, he might have to leave. Diehl refused to give plaintiff permission to leave. When plaintiff approached Diehl a second time, around 9:25 a.m., Diehl again denied plaintiff's request to leave. Plaintiff replied that

his home, wife, and children were more important than "this place," and then stated that he would wait awhile.

At approximately 9:45 a.m., when plaintiff telephoned his wife, she stated in a hysterical voice that water was at the doorstep and that water was pouring in through the window wells. Between 9:45 a.m. and 10 a.m., plaintiff changed from his uniform into civilian clothes and left the police department without receiving permission to do so.

At the time of plaintiff's departure, five other police officers, including two sergeants and Lieutenant Diehl, were stationed at the desk area where the three-line switchboard was located. Plaintiff was observed by the chief of police, Diehl and Captain Clark as he left the station and heard them mention his name in a conversation amongst themselves. Plaintiff's position was replaced within a half an hour from his departure, and no incoming telephone calls were left unanswered.

The evidence at the hearing conflicted regarding the details surrounding plaintiff's departure. Plaintiff testified that, when he first approached Diehl regarding the problem, Diehl stated that his wife should "start bailing." Diehl denied making such a remark. Plaintiff also stated that Diehl did not respond when he spoke with him a third time and requested that he speak to the chief of police on his behalf. Diehl denied speaking with plaintiff following the second conversation.

At the hearing, Diehl described the situation at the department the morning of plaintiff's departure. The department was taking incoming telephone calls, but could not make any outgoing calls. The officers were barely able to keep up with the flood-related inquiries. No squad cars were available to answer calls, and officers could not respond to all the power and alarms going off in the city. Because they could not call in additional manpower, officers on the street drove to the homes of officers living in the city to tell them to report to the station. The two sergeants manning the desk area at the time described the situation as "very hectic" and "very busy."

When plaintiff arrived at the entrance to his subdivision after the 45-minute, eight-mile drive to his townhouse development, he could not proceed farther. Although the rain and the spread of water had ceased by this time, plaintiff had to walk the quarter mile to his home in water levels he estimated as ranging from ankle depth to chest high. When plaintiff reached his home, he first checked his family's safety, then checked his basement, which sustained minimal damage

due to the four to six inches of water, and shortly after 11 a.m. checked on his neighbors.

Witnesses at the hearing further described the conditions at the townhouse development that day. Plaintiff's wife, who was five feet 2 inches in height, estimated the water in the street outside her home to be waist high at the time she spoke to plaintiff that morning. She testified that cars were unable to enter or exit the development until the next day. Plaintiff's neighbor stated that the water level, estimated to be 2½ to 3 feet high in the street at 9 a.m., did not subside until late afternoon. Plaintiff estimated that the water level on the street near his townhouse, as depicted in photographs taken by him sometime after 2 p.m., varied from one foot to two feet.

Plaintiff spent the remainder of the afternoon until dusk filling and hauling sandbags around his and his neighbors' homes because more rain was expected and a flash-flood warning was in effect until 2 p.m. Plaintiff could not make outgoing calls from 11 a.m. until the early evening. At approximately 9:30 p.m., Officer Timothy Veit telephoned plaintiff at his home to inform him of the 12-hour shifts at the station. Plaintiff telephoned the watch commander, Lieutenant Storm, at 9:50 p.m. to advise him of his availability for duty. Storm told plaintiff that plaintiff was put on emergency suspension with pay.

At the hearing, the parties presented evidence regarding the existence of emergency conditions and plaintiff's knowledge of such at the time of his departure. Plaintiff testified that he left a non-emergency switchboard and that he did not receive any emergency calls on that date. He was never informed of the existence of an emergency and was not informed of 12-hour shifts, which would indicate emergency conditions, until Veit's telephone call at 9:30 p.m. Plaintiff was aware that, sometime late in the afternoon of August 14, an emergency command center for the *Wheeling* police department and public works department was established at the clubhouse near his townhouse. In plaintiff's opinion, there was no emergency at the time he left the police station.

Sergeant Neal explained that the switchboard, not the area, is classified as "non-emergency" because emergency calls are generally taken in another area, although emergency calls quite often come into the switchboard. Diehl testified that the city was in a state of emergency on the morning of August 14, but admitted that a formal declaration of emergency was never announced and that he never informed plaintiff of the existence of a state of emergency. The chief of police testified that he gave the order to implement the 12-hour shifts, but it

was not implemented until Captain Sturlini's arrival at the station at approximately 10:30 or 11 a.m.

At the hearing, the Board also heard charges against plaintiff stemming from a June 17, 1987, incident with a motorist. At approximately 6 a.m. on that morning, plaintiff stopped a car for driving in excess of the speed limit. Louis Sheffield, the driver of the car, inquired into plaintiff's purpose for stopping the car. Plaintiff did not respond, but instead requested Sheffield's driver's license. Plaintiff then informed Sheffield he was going 61 miles per hour in a 40-mile-per-hour zone and told him to return to his car.

When Sheffield leaned against his car, plaintiff ordered him inside his vehicle over the public address system. On plaintiff's return to the car, Sheffield leaned out of his door and stated that plaintiff had a bad attitude. Sheffield testified that plaintiff began to get "hyper," agitated and excited. Sheffield said, "[F]orget it, give me the fuckin' ticket," and threw the ticket on the dashboard. Sheffield testified that he was agitated because of plaintiff's tone of voice and plaintiff's failure to listen to his reasons for speeding.

The testimony of plaintiff and Sheffield conflicted at the hearing regarding the physical contact made thereafter. Plaintiff testified that Sheffield struck plaintiff's hand when he handed him the ticket. He responded by grabbing Sheffield's hand, turning it over, and extending it out. He then used his right hand to push against Sheffield's left shoulder to prevent him from opening the door.

Sheffield and Billy Clifford, the passenger in the car, immediately following the incident proceeded to the police station and signed a complaint against plaintiff.

When plaintiff arrived at the station later, he inquired of Lieutenant Diehl whether "the beef had come in yet." Sergeant Neal testified that he heard plaintiff state, upon being informed that the complaint had been filed, "Smartass, I should have broke his arm." Neal prepared a written memorandum dated June 18, 1987, reflecting the remark. Plaintiff denied that he said "[S]martass" and explained that the latter comment was just an off-the-cuff remark to a fellow officer.

On appeal, we first address plaintiff's contention that he was denied a fair and impartial hearing. Plaintiff argues that, despite admonishments given by the Board's attorney, the Board was prejudiced by outside matters. Plaintiff asserts that Chairperson Wilson's reported comments in a local newspaper article, "[i]t's very difficult to try and not to be prejudiced when everybody and their brother has an opinion," demonstrates the insufficiency of the admonishments.

■■ Without a showing to the contrary, State administrators are assumed to be capable of judging a particular controversy fairly on the basis of its own circumstances. (*Collura v. Board of Police Commissioners* (1986), 113 Ill. 2d 361, 370, 498 N.E.2d 1148, 1152.) The required showing to overcome the presumption of administrative regularity is set forth in *Citizens For a Better Environment v. Pollution Control Board* (1987), 152 Ill. App. 3d 105, 111-12, 504 N.E.2d 166, 171. Plaintiff must show by clear and convincing evidence "that the official has an unalterably closed mind in matters critical to the disposition of the proceeding."

■ Plaintiff has not demonstrated by clear and convincing evidence that Wilson had an unalterably closed mind. The unsubstantiated hearsay comments did not state that Wilson himself found it difficult not to be prejudiced, and the same article quotes Wilson's response to people who try to "bend his ear" as "we can't listen." There being no showing to the contrary, we cannot say that plaintiff was denied a fair and impartial hearing.

■ Plaintiff next argues that the findings of the Board are against the manifest weight of the evidence. Our role on administrative review of an agency's decision to discharge a public employee is limited to, first, determining whether the agency's finding of guilt is contrary to the manifest weight of the evidence, and, second, to determine if the findings of fact provide a sufficient basis for the agency's conclusion that cause for discharge is warranted. *Walsh v. Board of Fire & Police Commissioners* (1983), 96 Ill. 2d 101, 105, 449 N.E.2d 115, 117; *Bultas v. Board of Fire & Police Commissioners* (1988), 171 Ill. App. 3d 189, 193, 524 N.E.2d 1172, 1174.

■ Review under the first inquiry requires a court to consider the agency's findings of fact to be *prima facie* true and correct, although the court has a duty to examine the evidence in an impartial manner and to set aside findings unsupported in fact or unsupported by substantial evidence in the record. (*Dugan's Bistro, Inc. v. Daley* (1977), 56 Ill. App. 3d 463, 467, 371 N.E.2d 1116, 1119.) The Board in the case at bar found plaintiff violated the following rules and regulations as a result of his conduct on August 14, 1987:

> "9. *** Rule 310.02 of the Rules and Regulations entitled 'Unbecoming Conduct,' in that having been denied permission to leave his assigned post and go home *** [plaintiff] did state words to the effect that his family was more important than his job. [Plaintiff] then left his assigned post and [*sic*] the Des Plaines Police Station. *** [Plaintiff] did not return to duty on

August 14, 1987 and was out of contact with the Police Department for approximately 12 hours.

10. *** Rule 310.30 of the Rules and Regulations entitled 'Performance of duty,' in that [plaintiff] failed and refused to perform his duties as a police officer for the City of Des Plaines when he left the City three hours after his eight-hour shift began, in defiance of his superior officer['s] *** order denying [his] request to go home.

11. *** Rule 310.16 of the Rules and Regulations entitled 'Duty Responsibilities,' in that [plaintiff] failed to respond to his superior officer['s] order denying [plaintiff's] request to go home *** [and] remaining out of contact with the Police Department and, therefore, did not subject himself to duty.
***

13. *** Rule 320.30 of the Rules and Regulations entitled 'Relief,' in that on that date, [plaintiff] failed to remain at this assigned post and on duty until he was properly relieved by another member of the Police Department or was dismissed by competent authority.

14. *** Rule 320.50 of the Rules and Regulations entitled 'Absence from Duty,' in that *** [plaintiff] failed to appear for duty from approximately 10:00 a.m., the time he left the Des Plaines police station without permission and in defiance of Lt. Diehl's order, to 3:00 p.m., the time his duty shift ended.
* * *

17. *** Rule 310.24 of the Rules and Regulations entitled 'Insubordination,' in that [plaintiff], while on duty and after receiving *** his superior officer's lawful order that he not leave his post to go home, deliberately refused to obey said lawful order, left his assigned post *** and went to his home in Wheeling, Illinois."

Plaintiff does not dispute the Board's finding that he left his assigned post without permission and remained out of contact from the police department or that this conduct would be a sufficient basis for finding that plaintiff violated the above-stated department regulations. Plaintiff, though, disputes certain other factual findings which he claims the Board relied on to find cause for dismissal, namely, that a state of emergency existed when plaintiff left his assigned post and that plaintiff's departure had an adverse effect on the police department.

The Board asserts that plaintiff's admission of the existence of a city-wide emergency when he left his post, as well as evidence of the circumstances surrounding plaintiff's departure, supports the Board's

finding that plaintiff left his post during a state of emergency. The chief of police, on the other hand, argues that plaintiff was not discharged because a state of emergency existed in the city, but rather because plaintiff abandoned his assigned post contrary to a lawful order of his superior officer.

In paragraph 5 of the "Second Amended Statement of Charges," the chief of police alleged "[t]hat on August 14, 1987, a state of emergency existed in the City of Des Plaines due to the extreme amount of rain which caused widespread flooding throughout the City of Des Plaines." Although the Board did not expressly find that plaintiff left his post during a state of emergency, it noted, in paragraph 21, that plaintiff "acknowledged that as a result of his conduct *in abandoning his post on August 14, 1987, during a city-wide emergency*, his fellow officers can no longer rely on him to carry out his assigned duties and to always be there when they need him." In paragraph 20 of its discharge order, the Board also states that plaintiff left his assigned post on a day when "approximately nine (9) inches of rain fell on the City, *resulting in a city-wide emergency.*" In finding plaintiff guilty of "Unbecoming Conduct" in paragraph 9 of the order, the Board further notes that plaintiff's conduct brought the Department into disrepute "*at the very time when officers were needed to handle a major disaster* in the City of Des Plaines."

■ We note that the discharge order states that the Board relied on all its findings of fact and guilt in finding "cause for the officer no longer occupying his position." In light of the factual findings set forth above, we conclude that the Board considered the existence of emergency conditions in reaching its decision to discharge plaintiff.

■ While the record supports a finding that the City experienced severe weather conditions and at some point invoked emergency plans on August 14, 1990, a finding that plaintiff was aware of a state of emergency or that he abandoned his post during a state of emergency is not supported by the evidence. When plaintiff left the station between 9:45 and 10 a.m., in the presence of his superiors, he was not informed of a declaration of emergency. The 12-hour shifts, testified to by defendants' expert as being indicative of emergency conditions, were not implemented until after his departure. In addition, irrespective of the classification of the switchboard, plaintiff testified that he received no emergency calls before he left the switchboard and that five other persons were present in the area who could have operated the three-phone switchboard.

We do not believe that plaintiff's knowledge of the heavy rainfall and flooding and of the department's implementation of an emergency

traffic plan at the time he left his post is sufficient evidence to find a state of emergency or to impute knowledge of such to plaintiff. Nor do we believe that such findings can be upheld from plaintiff's affirmative responses to opposing counsel's inquiry of whether he breached his sworn duty when he "abandoned [his] post on August 14 during a city-wide emergency" and to the statement that his fellow police officers can no longer rely upon him as a result of his conduct "in abandoning [his] post on August 14 during a city-wide emergency." These multifaceted questions contain the undisputed fact that plaintiff left his assigned post without permission, and plaintiff's clear position throughout the hearings was that emergency conditions did not exist at the time of his departure.

Accordingly, insofar as the Board found that a state of emergency existed on plaintiff's departure or that plaintiff was aware of the existence of a state of emergency, those findings are against the manifest weight of the evidence.

■ As to the finding that plaintiff's departure had an adverse effect on the police department, the Board specifically found that plaintiff's conduct "brought the Department into disrepute and reflected discredit upon the plaintiff, at the very time when officers were needed to handle a major disaster in the City of Des Plaines." The only expert testimony in this regard was from Glenn R. Murphy, a law enforcement consultant, who testified that plaintiff's actions in leaving his assigned post during a state of emergency adversely affects the administration of the agency. Murphy stated that disobeying lawful orders undermines the command structure of the agency and that such conduct during emergency situations detrimentally affects the morale of the agency and the community relations of the department with its constituencies. Because the expert's opinion was premised upon the circumstances of an officer leaving an assigned post *during a state of emergency*—circumstances found above to be unsupported by the evidence—the expert's testimony does not provide a basis for upholding the Board's finding that plaintiff's conduct brought the department into disrepute.

We turn now to the Board's findings as to the June 17, 1987, motorist incident. While the Board found that plaintiff used reasonable force to defend himself in the June 17 traffic incident, it found that plaintiff violated rule 380.54 of the rules, entitled "Conduct toward the Public," "in that when issuing a traffic citation to Louis B. Sheffield, [plaintiff] failed to remain courteous and orderly, and failed to remain calm, regardless of provocation to do otherwise." Rule 380.54 provides that "Members and employees shall be courteous and orderly

in their dealings with the public. They shall perform their duties quietly, avoiding harsh, violent, profane or insolent language and shall always attempt to remain calm, regardless of provocation to do otherwise."

■ The Board rejected Sheffield's claim that plaintiff was not justified in using force at the scene. The remainder of Sheffield's testimony does not support a finding that plaintiff did not act orderly at the scene. Nor does the evidence as to plaintiff's remarks at the police station support the finding. The remarks were not made in plaintiff's *dealings with the public* since they were made outside the presence of the motorists and public. In any event, the Board did not base its discharge sanction on the June 17, 1987, incident, but relied "particularly [on its] findings pertaining to [plaintiff's] conduct on August 14, 1987."

In summary, the Board's findings that plaintiff violated numerous department regulations in leaving his assigned post without permission are supported by the evidence. Insofar as the Board relied on the fact that plaintiff left his assigned post during a state of emergency, the fact that plaintiff's conduct brought the department into disrepute, and any rule violations resulting from the June 17, 1987, motorist incident, those findings are against the manifest weight of the evidence.

■ Under the second phase of our inquiry, we must determine whether the Board's valid findings provide a sufficient basis for cause for discharge. Our role in this regard is not that of a supercommission, which may substitute its judgment as to the more fitting sanction. Rather, we are confined to determining whether the agency's findings are related to the requirements of the service and not so trivial as to be arbitrary or unreasonable. *Walsh*, 96 Ill. 2d at 105, 449 N.E.2d at 117; *Humbles v. Board of Fire & Police Commissioners* (1977), 53 Ill. App. 3d 731, 734, 368 N.E.2d 1049, 1051; *Petraitis v. Board of Fire & Police Commissioners* (1975), 31 Ill. App. 3d 864, 868, 335 N.E.2d 126, 130.

■ In examining the case law pertinent to our inquiry, we have discovered that, in reviewing administrative discharge orders, the conduct must be evaluated under the circumstances of each case, and that no precise rules or definitions may be drawn as to what conduct will be found to constitute cause for discharge. Reviewing courts, however, are assisted by the general guideline that the "conduct must constitute some substantial shortcoming which renders [the] continuance in office detrimental to the discipline and efficiency of the service, and which the law and sound public opinion recognize as good

reason for the officer to no longer hold his position." *Onesto v. Police Board of the City of Chicago* (1980), 92 Ill. App. 3d 183, 187, 416 N.E.2d 13, 16; *Coursey v. Board of Fire & Police Commissioners* (1967), 90 Ill. App. 2d 31, 37, 234 N.E.2d 339, 341-42; *Christenson v. Board of Fire & Police Commissioners* (1980), 83 Ill. App. 3d 472, 476, 404 N.E.2d 339, 341.

In considering plaintiff's conduct here and comparing it to the conduct found to warrant or not to warrant discharge in prior appellate court decisions, we find that plaintiff's conduct is not such that the continuation of his employment would be detrimental to the discipline and efficiency of the police department, or such that sound public policy would mandate that plaintiff be discharged.

Present in the cases found by Illinois appellate courts to warrant discharge, and absent from the case at bar, are the type of actions which reflect dishonesty or a flaw in integrity or character and which carry an implication that the officer is unfit to serve as a police officer. In *Coursey v. Board Fire & Police Commissioners* (90 Ill. App. 2d 31, 234 N.E.2d 339), the discharged police officer left his assigned beat and the village limits without being relieved, and evidence was presented that the officer's purpose was to attempt sexual misconduct with minors he was escorting home after curfew. The court noted that the officer did not offer justification for his conduct or notify the department of his absence and that the gravity of his act was intensified by a similar incident six months earlier. The court also stated that the officer's actions seriously weakened the plan of community protection by disabling the officer from responding quickly to threats to life and property within his jurisdiction. *Coursey*, 90 Ill. App. 2d at 37, 234 N.E.2d at 342.

In *Bokowski v. Civil Service Comm'n* (1971), 1 Ill. App. 3d 174, 273 N.E.2d 625, the discharged Chicago fireman, in defiance of previous orders, left his assigned apparatus for a period between two and three hours while he went to an alcohol-serving dance hall located outside the hearing of fire alarm indicators. The fireman was later involved in an altercation after a witness observed him being escorted from the women's washroom.

The discharged police officer, in *Green v. Board of Fire & Police Commissioners* (1980), 87 Ill. App. 3d 183, 408 N.E.2d 1187, slept in his squad car for two hours while assigned to patrol and disobeyed an order to return to the police station. The court noted that the officer offered no excuse for his conduct, that his conduct was "a serious case of neglect of duty," that the department's resources had to be diverted from other activities in an attempt to locate him, and that a

broadcast over the State police radio network was necessitated. *Green,* 87 Ill. App. 3d at 187, 408 N.E.2d at 1190-91.

In contrast to the conduct in the above cases, the officer's misconduct here does not reflect a flaw in integrity or character. Plaintiff's actions were motivated by concern for the safety of his wife and two small children. Furthermore, plaintiff did not deceive his superior officers, unlike the cases where the officer left an assigned jurisdiction without notification, thereby jeopardizing the protection of the community in that area. Plaintiff left the desk area containing three telephone lines where five other officers were present and brought his departure to the attention of his superiors. Finally, as indicated previously, although serious flooding conditions existed at the time, the evidence does not demonstrate a state of emergency at the time plaintiff left or that plaintiff was aware of a state of emergency.

The circumstances present here are more analogous to *Christenson* (83 Ill. App. 3d 472, 404 N.E.2d 339) and *Humbles* (53 Ill. App. 3d 731, 368 N.E.2d 1049), where courts found discharge to be unwarranted. In *Christenson,* an officer violated department rules by using his police vehicle while on duty for a personal errand 15 miles outside the city and lied to a superior officer about the personal business. The court there noted several mitigating factors, including the fact that the officer was confronted with an emergency situation concerning criminal damage to his valuable horses, the fact that the officer put another officer in charge rather than abandon his responsibilities, the fact that no emergency existed in the city, and the fact that the officer worked an hour after his shift. *Christenson,* 83 Ill. App. 3d at 477, 404 N.E.2d at 342.

The police officer in *Humbles* lied to his superior officer that he was attending court on police business when his actual business was his personal divorce case. He also disobeyed his superior's order to wait and proceed to court with him. Although the court recognized that the misconduct might tend to interfere with the discipline and efficiency of the police department, it concluded the sanction of discharge was not warranted. The court stated that the purpose of the officer's deception was to avoid a subject of embarrassment to himself and that the single incident did not carry an implication that the officer was unfit to serve as an officer or have an effect of lowering police morale or public confidence.

Plaintiff's concern for his family's welfare is even a greater mitigating circumstance than the concern for property in *Christenson* or the concern of embarrassment in *Humbles.* In addition, absent here is the aggravating circumstance of deceptive conduct present in those

cases. No other aggravating circumstances exist here to justify discharge. While the circuit court noted that plaintiff did not return to the station after he had seen to the safety of his house and family, we do not believe this fact justifies discharge. Only a few hours remained on plaintiff's assigned shift and plaintiff was not aware of the imposition of 12-hour shifts. Moreover, the misconduct here involved a single incident, unlike cases upholding discharge sanctions where the officer has a history of flagrant, deliberate, and continuing disobedience of orders which would undermine the authority and weaken the structure of the organization. See *Martin v. Matthys* (1986), 149 Ill. App. 3d 800, 808, 501 N.E.2d 286, 292.

■■■ For the reasons expounded above, we hold that the circuit court erred in finding the Board's decision to be related to the requirements of service. We alternatively find that sufficient evidence was presented as to a penalty imposed against another police officer for his misconduct during the same period of flooding to demonstrate that the Board's decision was arbitrary and unreasonable.

Officer Czyzewski, who was off duty on August 14, 1987, was contacted by a superior between 8:40 and 8:50 a.m. and ordered to report to duty, despite his repeated protests that his street was impassable. Czyzewski refused by responding with an obscenity. Czyzewski was given a four-day suspension for insubordination, and no charges were brought for his failure to report. The circuit court found that the actions of the two police officers were markedly different in that plaintiff was punished for leaving his assigned post, while Czyzewski was suspended for swearing at a superior who had insisted that Czyzewski report to work even though he was off duty and "hemmed in" by water.

We find little significance in the fact that Czyzewski was off duty at the time. The necessity of police officers to report to duty on command is no less important to the efficiency of the department than the necessity of police officers to remain on assigned duty. The circuit court's reliance on testimony that Czyzewski was "hemmed in" by water is inconsistent with its reliance on its finding that plaintiff should have returned to the station after reaching his home and family under the flooding conditions. Plaintiff's conduct here is not so markedly different from Czyzewski's conduct to warrant such a more severe sanction. Both officers disobeyed orders from their superiors and did not work on assigned shifts.

■■■ Notwithstanding our findings that the sanction of discharge was unrelated to the needs of the department and arbitrarily and unreasonably imposed, plaintiff's conduct in disobeying a superior offi-

cer's orders and leaving an assigned post was not excused under the circumstances and discipline was warranted. The discipline necessarily inherent in a police department would be destroyed if each officer is permitted to subjectively determine whether he believes an order to be lawful or reasonable. See *Martin*, 149 Ill. App. 3d at 808, 501 N.E.2d at 292.

Accordingly, the sanction of discharge imposed by the Board is vacated. Pursuant to the scope of our limited review, we remand this matter to the Board for consideration of an alternative, more appropriate sanction. See *Kreiser v. Police Board* (1977), 69 Ill. 2d 27, 370 N.E.2d 511; *Christenson*, 83 Ill. App. 3d 472, 404 N.E.2d 339; *Citrano v. Department of Registration & Education* (1980), 90 Ill. App. 3d 937, 414 N.E.2d 74; *Basketfield v. Daniel* (1979), 71 Ill. App. 3d 877, 390 N.E.2d 492.

Reversed and remanded.

MANNING, P.J., concurs.

JUSTICE CAMPBELL, dissenting:

I respectfully dissent for two reasons. First, the findings of the Board in regard to whether an emergency existed on August 14, 1987, are not against the manifest weight of the evidence.

Findings and conclusions of an administrative agency on questions of fact are to be held *prima facie* true and correct. (Ill. Rev. Stat. 1987, ch. 110, par. 3—110.) Where an opposite conclusion is not clearly evident, the decision cannot be reversed; that an opposite conclusion might be reasonable is not sufficient. (*Kvidera v. Board of Fire & Police Commissioners* (1989), 192 Ill. App. 3d 950, 960, 549 N.E.2d 747, 753; *Keen v. Police Board* (1979), 73 Ill. App. 3d 65, 70, 391 N.E.2d 190, 194-95.) Moreover, conflicts in testimony and the credibility of witnesses are properly left for the Board to resolve. (*Price v. Board of Fire & Police Commissioners* (1985), 139 Ill. App. 3d 333, 339, 487 N.E.2d 673, 677.) The Board's findings cannot be reversed unless we are able to say that "*all* reasonable and unbiased persons, acting within the limits prescribed by the law and drawing all inferences in support of the finding[s], would agree that the finding[s] [are] erroneous." (Emphasis added.) *Sheehan v. Board of Fire & Police Commissioners* (1987), 158 Ill. App. 3d 275, 287, 509 N.E.2d 467, 476.

The majority holds today that there is insufficient evidence to support the findings in the Board's order discharging the plaintiff. The

contested findings include: paragraph 20 of the discharge order, which found that plaintiff abandoned his assigned post when "approximately nine (9) inches of rain fell on the City, resulting in a city-wide emergency"; paragraph 21, which finds that plaintiff "acknowledged that as a result of his conduct in abandoning his post on August 14, 1987, during a city-wide emergency, his fellow officers can no longer rely on him to carry out his assigned duties and to always be there when they need him"; and paragraph 9, which finds that plaintiff's conduct brought the Des Plaines police department into disrepute "at the very time when officers were needed to handle a major disaster in the City of Des Plaines."

The record contains substantial evidence in support of the Board's finding that there was a city-wide emergency at the time plaintiff abandoned his post. Lieutenant Diehl's testimony supports this finding. Plaintiff himself acknowledged that he left his post during an emergency. Plaintiff was aware that there was excessive rainfall and that a number of roadways were impassible as a result. Plaintiff was assigned to the complaint desk at 6:45 a.m., and the officers assigned to the desk were subsequently advised of the implementation of the City's emergency traffic plan.

The police were barely able to keep up with flood-related calls; officers were unable to respond to the power outages and alarms that resulted from the flood conditions. The police were also unable to make outgoing calls and consequently could not call additional officers to duty except by driving out to their homes.

Nevertheless, plaintiff telephoned his wife three separate times that morning. The record also provides ample support for the inference that the reason plaintiff was concerned about his family was the flooding occurring in his neighborhood. Implicit in today's decision is that the flooding was somehow a serious enough danger to justify plaintiff's decision to abandon his assigned post, in defiance of the direct order of his superior, yet simultaneously not so obvious a danger as to allow the Board to find that plaintiff was aware of emergency conditions.

The evidence appearing in the record which suggests that an emergency did not exist is plaintiff's testimony that in his opinion, there was no emergency at the time he left. This testimony is contrary not only to the testimony of Lieutenant Diehl, but also to plaintiff's own acknowledgement that he left during a city-wide emergency. Plaintiff stated that there were five other persons who could have manned the switchboard following his departure, although the record reflects that plaintiff walked away from his duties as an officer during

a situation where the police department sought more officers, not fewer.

The majority chooses to discount Lieutenant Diehl's opinion that emergency conditions existed because he also stated that there had been no formal declaration of a "state of emergency." The majority also discounts the expert testimony that plaintiff's dereliction of his duties would adversely affect the police department because it was supposedly premised on the existence of a "state of emergency." The record contains no evidence that the expert was referring only to situations where there was a formally declared "state of emergency." The majority opinion finds that when plaintiff abandoned his post, "he was not informed of a declaration of emergency" (211 Ill. App. 3d at 554), but offers no suggestion of who would be required to issue such a declaration or what the declaration must encompass in order to support a finding that a "state of emergency" existed or that plaintiff was aware of it. (*Cf.* Ill. Rev. Stat. 1987, ch. 127, pars. 1104(b) (definition of "disaster"), 1108 (authorizing Governor to declare "disaster emergencies"), 1113 (authorizing principal executive officer of municipality to declare "local disaster emergencies").) The majority further fails to cite any authority for the proposition that there must be a formal declaration of a "state of emergency" before the Board could find that the conditions which existed were such that plaintiff knew or should have known that it would be a severe dereliction of duty to leave his post.

Given this record, it is my opinion that a reasonable and unbiased person, drawing all inferences in favor of the findings, could find that emergency conditions existed and that plaintiff was aware of them when he abandoned his post for personal reasons. (*Sheehan,* 158 Ill. App. 3d at 287, 509 N.E.2d at 476.) At most, the evidence conflicted regarding the existence of emergency conditions and plaintiff's knowledge of such at the time of his departure. The Board chose to resolve the conflicting evidence against plaintiff; we cannot choose otherwise. (*Price,* 139 Ill. App. 3d at 339, 487 N.E.2d at 677.) The majority's contrary finding may be reasonable, but it does not warrant a reversal in this case. *Kvidera,* 192 Ill. App. 3d at 960, 549 N.E.2d at 753; *Keen,* 73 Ill. App. 3d at 70, 391 N.E.2d at 194-95.

Second, I dissent because plaintiff's discharge is legally supportable regardless of whether a "state of emergency" had been declared or existed. In reviewing police discharges, the question for the appellate court is whether the sanction is unreasonable, arbitrary or unrelated to police service, not whether this court would have levied a lesser sanction. (See *Kloss v. Board of Fire & Police Commissioners*

(1983), 96 Ill. 2d 252, 258, 449 N.E.2d 845, 849.) The wisdom, necessity or propriety of any action regarding the administration of a police force is the province of the municipality and will not be reversed unless a manifest and palpable abuse of discretion is shown. (*Braje v. Board of Fire & Police Commissioners* (1985), 139 Ill. App. 3d 90, 487 N.E.2d 91.) This court has long held that an officer who disobeys a proper order of a superior may be discharged. *E.g., Zinser v. Board of Fire & Police Commissioners* (1961), 28 Ill. App. 2d 435, 172 N.E.2d 33.

The cases the majority classifies as involving "actions which reflect dishonesty or a flaw in integrity or character" (211 Ill. App. 3d at 557) are not distinguishable from the instant appeal on those grounds. For example, in *Coursey v. Board of Fire & Police Commissioners* (1967), 90 Ill. App. 2d 31, 234 N.E.2d 339, there was evidence that an officer attempted sexual misconduct with minors, but the board made no finding concerning that alleged attempt. (*Coursey*, 90 Ill. App. 2d at 41, 234 N.E.2d at 343.) In *Bokowski v. Civil Service Comm'n* (1971), 1 Ill. App. 3d 174, 273 N.E.2d 625, an officer was charged with neglect of duty, being absent from duty without permission and entering a place where liquor was sold while on duty for reasons unrelated to service. There was no charge alleging improper conduct concerning a fight or a women's washroom. In *Green v. Board of Fire & Police Commissioners* (1980), 87 Ill. App. 3d 183, 408 N.E.2d 1187, this court upheld the discharge of an officer who slept for two hours on patrol and disobeyed an order to return to the station. As in *Green*, a diversion of police resources was required by the plaintiff's behavior in this case. Moreover, Green did offer an excuse, though it was rejected as "no defense" by this court. *Green*, 87 Ill. App. 3d at 187, 408 N.E.2d at 1191.

The majority likens this case to *Christenson v. Board of Fire & Police Commissioners* (1980), 83 Ill. App. 3d 472, 404 N.E.2d 339, and *Humbles v. Board of Fire & Police Commissioners* (1977), 53 Ill. App. 3d 731, 368 N.E.2d 1049. These comparisons must rely on the supposed requirement of a "state of emergency." In *Christenson*, the officer tried to stay in radio contact with the station and "[h]is presence was not compelled by any emergency." (*Christenson*, 83 Ill. App. 3d at 477, 404 N.E.2d at 342.) The record here does not indicate that plaintiff tried to stay in contact with the station.

In *Humbles*, there was no indication that the officer's action would lower police morale or undermine public confidence in the police. (*Humbles*, 53 Ill. App. 3d at 735, 368 N.E.2d at 1051.) In this

case, the Board heard expert testimony on the issue, testimony the majority rejects as falsely premised.

The majority alternatively finds sufficient evidence regarding the conduct of another officer to indicate that the Board's penalty regarding plaintiff was arbitrary and unreasonable. The conduct of the other officer is not before this court. Sufficient cause for discharge may exist regardless of whether another officer received different treatment. (*Sheehan*, 158 Ill. App. 3d at 287, 509 N.E.2d at 476.) Moreover, one could logically conclude that the lesser sanction in the other case militates as much in favor of the lesser sanction being unreasonable. The majority also finds the circuit court's reliance on testimony that the off-duty officer was "hemmed-in" by water inconsistent with its finding that plaintiff should have returned to the station after checking on his family. Yet this supposed inconsistency would be justified if the finder of fact decided that the other officer was in fact "hemmed-in" and plaintiff was not. This court is not the finder of fact. Furthermore, it would appear that a similar inconsistency would then be manifest in finding that the flooding in plaintiff's neighborhood was severe enough to justify abandoning his post, but not severe enough in the other parts of the city to find that emergency conditions existed.

In sum, today's decision does not give sufficient weight to the reality that the police department is a paramilitary organization with a chain of command. (*Martin v. Matthys* (1986), 149 Ill. App. 3d 800, 501 N.E.2d 286.) A rule permitting each officer to subjectively determine whether he believes an order to be lawful and reasonable would destroy the discipline necessarily inherent in a paramilitary organization such as the police department (*Phillips v. Hall* (1983), 113 Ill. App. 3d 409, 447 N.E.2d 418; *Williams v. Police Board* (1972), 8 Ill. App. 3d 345, 290 N.E.2d 669; *Coursey*, 90 Ill. App. 2d 31, 234 N.E.2d 339) and would thwart the authority and respect which is the foundation of the effective and efficient operation of a police force. (See *Myers v. Cook County Police & Corrections Merit Board* (1978), 67 Ill. App. 3d 223, 384 N.E.2d 805.) Plaintiff's conduct cannot be excused. The discipline imposed was clearly related to the needs of the Des Plaines police department, given the facts and circumstances of this case.

For all of the aforementioned reasons, I would affirm the judgment of the Board and the circuit court.