(Nos. 72070, 72075 cons.—

CLIFFORD LAUNIUS, Appellee, v. THE BOARD OF
FIRE AND POLICE COMMISSIONERS OF THE
CITY OF DES PLAINES *et al.*, Appellants.

*Opinion filed September 24, 1992.—Rehearing
denied November 30, 1992.*

Burton S. Odelson, Mark H. Sterk, Denise K. Filan and Keri-Lyn J. Krafthefer, of Odelson & Sterk, Ltd., of Evergreen Park, for appellant Board of Fire & Police Commissioners of the City of Des Plaines.

Arthur C. Thorpe and Patrick A. Lucansky, of Klein, Thorpe & Jenkins, Ltd., of Chicago, for appellant Joseph Kozenczak.

Stanley H. Jakala, of Berwyn, for appellee.

Ronald N. Schultz, Legal Director, of Rockford, for *amicus curiae* City of Rockford.

Kelly R. Welsh, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon and Joan Flynn, of counsel), for *amicus curiae* City of Chicago.

Beth Anne Janicki, of Springfield, for *amicus curiae* Illinois Municipal League.

Daniel P. Jakala, of Berwyn, for *amicus curiae* Fraternal Order of Police Lodge 7.

John M. Hosteny, of Springfield, for *amicus curiae* Troopers Lodge No. 41, Fraternal Order of Police.

Thomas F. Sonneborn and James T. Harrison, of Forest Park, for *amicus curiae* Fraternal Order of Police, Illinois State Lodge.

JUSTICE MORAN delivered the opinion of the court:

Plaintiff, Clifford Launius, was discharged from his job as a police officer with the Des Plaines police department (the department). He filed a complaint for administrative review in the circuit court of Cook County against the defendants, the board of fire and police commissioners of the City of Des Plaines (the board) and Joseph Kozenczak, chief of police of the City of Des Plaines. The court affirmed the board's order and plaintiff appealed. The appellate court, with one justice dissenting, reversed and remanded the matter to the board so that it could consider a more appropriate sanction. (211 Ill. App. 3d 545.) This court allowed defendants' petitions for leave to appeal (134 Ill. 2d R. 315(a)).

The City of Chicago and the Illinois Municipal League filed briefs, as *amici curiae*, in support of defendants. Three lodges of the Fraternal Order of Police—Illinois State Lodge, Lodge Number 7, and Lodge Number 41—filed briefs, as *amici curiae*, in support of plaintiff.

The two issues presented for review are whether: (1) the board's findings were against the manifest weight of the evidence, and (2) the appellate court erred in overturning the board's decision to discharge plaintiff.

Plaintiff's discharge was primarily a consequence of his leaving work on August 14, 1987. On this particular day, plaintiff was scheduled to work from 7 a.m. until 3 p.m. He reported for work on time and was assigned to work the complaint desk located on the first floor of the police station. In this assignment, he was responsible for handling walk-in complaints from citizens and answering telephones. While at work that morning, he spoke with his wife four different times on the telephone.

At around 7:30 a.m., plaintiff telephoned his wife at home because, during the preceding hour, he "noticed that it was raining very, very hard outside." He asked her to check the basement of their town house, which she did, and she then told him that there was no seepage. However, she informed him that water from a nearby lake had overflowed and flooded the street in front of their home. Plaintiff spoke to his wife a second time between 8 a.m. and 8:15 a.m. During this telephone call, she informed him that water was seeping into the basement and it had spread onto their front lawn and to the garage. At around 9 a.m., plaintiff spoke to his wife a third time and, in an excited tone, she informed him that the basement was accumulating water and that the water continued to flow towards their house. At 9:45 a.m., plaintiff spoke to his wife a fourth time. He testified that during this last telephone call, his wife was hysterical because water had reached the doorstep of their home and it was coming through the window wells.

After the third telephone conversation with his wife, plaintiff informed Lieutenant Ronald Diehl that he might have to leave his post because water was entering his basement, flooding was becoming a problem, and lake water was approaching his home. Lieutenant Diehl denied his request. He approached Diehl a second time at approximately 9:25 a.m. and asked for relief, explaining that there is a time when the safety and welfare of one's

family comes before a job. Plaintiff testified that Diehl told him that it was a decision that plaintiff had to make and the lieutenant walked away. Shortly thereafter, he asked Diehl if he could request permission from the chief of police, but Diehl turned away without saying anything.

At approximately 9:45 a.m., he was concerned about the safety of his wife and two young daughters, who were five years and six months old at the time. He believed his wife and children were in jeopardy so he went to the locker room and changed into his civilian clothes. Plaintiff then exited the building and drove his car the eight-mile distance between the police station and his Wheeling town house.

According to plaintiff, the travel time between his home and the station is normally a 15-minute commute, but his trip back to his town house "took approximately 45 minutes to an hour." He parked his car at the entrance to the subdivision in which his town house was located because of the amount of water that had accumulated in the streets within the subdivision. From there, he walked the quarter mile to his town house. He saw that the street located in front of his home was filled with water to a level of about three to four feet high. He entered his home and, after checking on his family, proceeded down to the basement. He testified that his basement had "four to six inches of water" and he described the damage to his personal property as minimal. After safeguarding some personal belongings, plaintiff, from approximately 11 a.m. until dusk, helped his neighbors and hauled sandbags.

At 9:30 p.m., he received a telephone call at his home from Officer Timothy Veit, who informed him that 12-hour shifts were in effect at the police station. Twenty minutes later, plaintiff telephoned Lieutenant John Storm to make him aware that he was available if

needed. Storm replied that plaintiff was put on emergency-paid suspension.

Lieutenant Diehl's testimony before the board was generally as follows: that he was the watch commander on August 14, 1987, and his shift ran from 7 a.m. until 3 p.m.; that at approximately 9:45 a.m., plaintiff requested permission to go home because of the weather conditions and Diehl told him "no"; that plaintiff then replied "that his home, his wife, and kids [were] more important than this place," but that he would wait awhile; that at about 10 a.m., plaintiff left his post and exited the police station; that he was never told by the plaintiff that plaintiff's family was in danger; and that plaintiff never asked to speak to the police chief, Joseph Kozenczak.

Chief Kozenczak testified also, and his testimony was generally as follows: that he was standing outside the station with two other officers at around 10 a.m. on August 14, 1987, when he saw plaintiff; that Lieutenant Diehl told him that plaintiff had "just walked off the job"; that he suspended plaintiff with pay and filed charges seeking his dismissal; that he thought plaintiff's conduct would undermine the authority of the command staff to control the rank and file; and that because he left his post, plaintiff's position was filled by another officer who could have been used on the street.

Evidence was also presented relative to a June 17, 1987, incident involving plaintiff and Louis Sheffield, a motorist. Sheffield described the incident as follows: on June 17, 1987, at approximately 6 a.m., he was driving to work; he was pulled over by the plaintiff for a speeding violation; he exited his car in an effort to talk to plaintiff, but plaintiff would not listen to him, and he was told by plaintiff to return to his car; plaintiff approached the driver's side of Sheffield's automobile and, as he did so, Sheffield told plaintiff that he thought his attitude was lousy; after hearing this, plaintiff became

"hyper, excited or agitated"; that he took the ticket from plaintiff, threw it on the dashboard and said, "Just give me the f*** ticket"; plaintiff then grabbed him around the neck and pulled his wrist down towards his elbow; plaintiff then remarked, "Don't you ever snatch anything out of anybody's hand, especially mine"; and afterwards, he went to the police station and made a complaint of what had happened.

Plaintiff's testimony of what happened differed from Sheffield's in that he described the incident as follows: that as he was about to hand the ticket to Sheffield through the driver's side window, Sheffield "made a fist and batted [his] hand out of the car"; and that he grabbed Sheffield's left arm and extended it out through the door to avoid being struck by Sheffield.

Plaintiff was charged with violating the following department rules: (1) Rule 310.02 in that his acts constituted unbecoming conduct; (2) Rule 310.30 in that he failed to carry out his duty as a police officer; (3) Rule 310.16 in that he failed to remain on duty; (4) Rule 310.34 in that he failed to obey the rules and regulations of the department; (5) Rule 320.30 in that he failed to remain on duty until he was relieved by another department employee; (6) Rule 320.50, in that he was absent from duty; (7) Rule 370.45 in that he used unnecessary physical force when issuing a traffic citation; (8) Rule 380.54 in that he failed to remain courteous and calm when he issued a traffic citation to a member of the public; and (9) Rule 310.24 in that he deliberately disobeyed a lawful order to remain at his post.

The board conducted a hearing on the charges, and it found plaintiff guilty of violating the following rules: Rule 310.02, entitled "Unbecoming Conduct"; Rule 310.30, entitled "Performance Of Duty"; Rule 310.16, entitled "Duty Responsibilities"; Rule 310.34, entitled "Obedience To Laws And Regulations"; Rule 320.30, en-

titled "Relief"; Rule 320.50, entitled "Absence From Duty"; Rule 380.54, entitled "Conduct Toward The Public"; and Rule 310.24, entitled "Insubordination." Particularly because of its findings relative to the August 14 incident, the board ordered that plaintiff be discharged from his position as a police officer.

Plaintiff then filed a complaint for administrative review in the circuit court of Cook County, and the court confirmed the board's decision, concluding that the board's decision "was neither contrary to the manifest weight of the evidence nor contrary to law." Plaintiff appealed, and a divided appellate court held: (1) that the following findings of the board were against the manifest weight of the evidence—that plaintiff either knew of, or left his post during a state of emergency; that plaintiff's conduct brought the department into disrepute; that plaintiff failed to remain calm when Sheffield was issued a traffic ticket; and (2) that the board's decision to discharge plaintiff was unrelated to the needs of the department, arbitrary, and unreasonable.

The first issue presented for review is whether the board's findings were against the manifest weight of the evidence. Defendants contend that the record, especially plaintiff's admissions, amply support the board's findings. Plaintiff maintains that the appellate court decision is correct, because the board's finding that a state of emergency existed at the time plaintiff left the police station was contrary to the manifest weight of the evidence.

Because the board is an administrative agency, its findings of fact on review "shall be held to be prima facie true and correct." (Ill. Rev. Stat. 1985, ch. 110, par. 3—110.) When reviewing the findings of an administrative agency, a court should inquire whether the findings are against the manifest weight of the evidence. It is not the court's function to resolve factual inconsisten-

cies, nor is it the court's duty to weigh the evidence and then determine where the preponderance of the evidence lies. *Collura v. Board of Police Commissioners* (1986), 113 Ill. 2d 361, 372-73.

The appellate court first stated that "the Board did not expressly find that plaintiff left his post during a state of emergency." (211 Ill. App. 3d at 554.) Yet, later in its opinion, the court concluded that the board's findings were against the manifest weight of the evidence "insofar *as the Board found* that a state of emergency existed on plaintiff's departure or that plaintiff was aware of the existence of a state of emergency." (Emphasis added.) (211 Ill. App. 3d at 555.) After reviewing the discharge order of the board, together with the record of the hearing, this court concludes that the board did not find that plaintiff left his post during a "state of emergency."

Nowhere in its written discharge order does the board even refer to a "state of emergency." Instead, the board found that plaintiff violated seven rules of the department when he left his post on August 14, 1987, *"the day* that the City of Des Plaines experienced the worst flooding in its history." (Emphasis added.) The chief of police testified: that the City of Des Plaines had over nine inches of rain; that it had suffered some of the worst flooding in the city's history; that approximately 7,000 homes and over 200 businesses were impacted by the flooding; and that about half of the city's streets "were totally blocked off." A report which summarized the impact of the flood on the City of Des Plaines was admitted into evidence and offered, according to counsel for the police chief, "just to show the extent of the flooding that took place in the city and how many buildings, homes and streets were affected." The board simply described the day on which the incident occurred and did not find, as the appellate court erroneously deter-

mined, that plaintiff left his post at a time when a state of emergency existed.

To the extent that the board's discharge order may be read such that it considered the circumstances surrounding plaintiff's departure to be in the nature of an emergency, ample evidence was presented before the board in this regard. As Justice Campbell correctly stated in his dissenting opinion, "At most, the evidence conflicted regarding the existence of emergency conditions and plaintiff's knowledge of such at the time of his departure." 211 Ill. App. 3d at 562 (Campbell, J., dissenting).

Plaintiff admitted that while driving to work he listened to a news station on the radio and learned that "we had standing water in the roadway" and that "[s]ome roads were impassible." The very reason plaintiff first contacted his wife from work was because he "noticed that it was raining very, very hard outside." Based on his conversations with his wife, plaintiff learned that the City of Des Plaines was having flood-related problems. Plaintiff admitted that while he worked the desk that morning, he answered questions from citizens who called the department seeking information relative to the flooding in the City of Des Plaines. Plaintiff testified that 90% of the calls that came into the desk area that morning concerned traffic redirection and, given that fact, he "imagine[d]" this was because there was standing water in the roadway.

Police Officer Ronald Roepke, who was assigned to work the desk area along with plaintiff, described the desk area between the hours of 7 a.m. and 10 a.m. as "very hectic" and stated that he and plaintiff "were extremely busy." Police Officer John Engeriser was assigned to desk duty at 9:10 a.m., and he testified that "[h]undreds" of calls were coming into the station at around 10 a.m. Sergeant Neil also described the police

station as being "extremely busy" and stated that there were "a lot of phone calls [coming] in" and "many citizens [came] to the desk area window asking directions, asking what to do, and also filing accident reports." Lieutenant Diehl testified that there were four police officers answering phone calls at approximately 9 a.m. and that "[t]he [phone] lines were constantly being stacked or backed up." An expert witness, Glenn Murphy, opined that plaintiff's position on August 14, 1987, was an emergency position.

Plaintiff himself admitted that he had abandoned his post during a city-wide emergency. The board noted that plaintiff "acknowledged that as a result of his conduct in abandoning his post on August 14, 1987, during a city-wide emergency, his fellow officers can no longer rely upon him to carry out his assigned duties and to always be there when they need him." Plaintiff's testimony in this regard was as follows:

"Q. [Mr. Lucansky]: And it is your sworn duty to protect the lives and property of the citizens of Des Plaines, is it not?

A. [Clifford Launius]: Yes, it is.

Q. And when you abandoned your post on August 14 during a city-wide emergency, you breached that sworn duty, did you not?

A. Yes, I did.

\* \* \*

Q. Officer Launius, as a result of your conduct in abandoning your post on August 14 during a city-wide emergency, your fellow police officers can no longer rely upon you to carry out your assigned duties and to always be there when they need you—

\* \* \*

THE WITNESS: That's correct."

The appellate court discounted the above testimony on the basis that the questions were "multifaceted." However, plaintiff was called to the stand by counsel for

the chief of police and plaintiff testified as if he were under cross-examination. (See Ill. Rev. Stat. 1985, ch. 110, par. 2—1102 ("Examination of adverse party or agent").) The general rule is that witnesses cannot be asked leading questions *except* on cross-examination. The very nature of leading questions is that they are suggestive of "the answer by putting into the witness' mind the words or thought of the answer." *People v. Cobb* (1989), 186 Ill. App. 3d 898, 915, citing *People v. Schladweiler* (1925), 315 Ill. 553, 556.

On the other hand, the evidence before the board which showed a lack of emergency was generally as follows: plaintiff described the switchboard at the complaint desk as a nonemergency switchboard; and he identified a position description and a general order of the department which described the switchboard as nonemergency. Plaintiff testified: that he received no emergency calls while he worked the desk that morning; that no emergency occurred while he was on duty; that he was never told of an emergency, nor was there a declaration of emergency; that he was unaware of flooding, but what information he had only pertained to impassable roadways; that he did not learn that an emergency-traffic plan had been put into effect until he heard it at the hearing; that he was not aware of police officers' becoming emergency personnel; that at the time he left the station he was unaware that the department instituted 12-hour shifts; that he was also unaware of "any manpower call-backs"; that he asked for permission to leave because there were six officers at the desk and that "none of them were totally and completely busy"; and that it was his opinion that there was plenty of manpower to replace him. Also, there was evidence presented that a fellow officer filled plaintiff's post within a half hour after plaintiff left the station.

Plaintiff directs our attention to the testimony of the following police officers, which he maintains further shows that no emergency-type conditions existed around the time plaintiff left the station: that Police Officer William Prim testified that he was not contacted at his part-time job on August 14, 1987, even though Lieutenant Diehl knew he was there; that Police Officer Juan Tovar testified that he was permitted to leave work prior to the end of his shift on August 15, 1987, so that he could attend a wedding; that Police Officer Gerald Loconsole was on vacation on August 14, 1987, and told to leave the station because he would have to stay if a superior officer saw him; and that Police Officer Richard Czyzewski was at home on a scheduled day off on August 14, 1987, and that he refused to report to work when told to do so by Sergeant Neil. As was said earlier in this opinion, the evidence which tended to show whether emergency conditions were present within the desk area or the department in general conflicted at best.

The appellate court also found that other findings of the board were unsupported by the evidence. The board found that plaintiff left his post after having been denied permission to leave; that after leaving the station, he did not return to duty; and that he remained out of contact with the department for a 12-hour period. The board found that such conduct "brought the Department into disrepute *** at the very time when officers were needed to handle a major disaster in the City of Des Plaines."

The appellate court determined that the only evidence which could justify the board's disrepute finding was supplied through the testimony of Glenn Murphy, an expert in police management, morale and discipline. Murphy testified that plaintiff's conduct undermined the command structure of the department and it also adversely affected the department's relationship with the

community. However, the appellate court determined that Murphy's testimony could not support the board's finding "[b]ecause the expert's opinion was premised upon the circumstances of an officer leaving an assigned post *during a state of emergency*—circumstances found \*\*\* to be unsupported by the evidence." (Emphasis in original.) 211 Ill. App. 3d at 555.

Counsel for the chief of police, on numerous occasions, asked for Murphy's opinion while stating in his question that plaintiff had left "his assigned post during a state of emergency." Plaintiff's counsel objected only once, contending that the question should *include* the "extenuating circumstances relative to [plaintiff's] situation," and not because the question made reference to a state of emergency. The questions posed to Murphy cannot now be considered erroneous, because a proper objection was not made at the hearing. (See, *e.g., Smith v. Illinois Valley Ice Cream Co.* (1959), 20 Ill. App. 2d 312, 321 (contention that certain facts within a hypothetical question were not in evidence "was waived by failure to point out the elements improperly included in the question").) Moreover, there were even instances in the record where plaintiff's attorney, during Murphy's cross-examination, asked for Murphy's opinion based on the assumption that an emergency situation existed within the department. Nevertheless, Murphy's testimony does support the board's finding because, as stated earlier in this opinion, there was evidence before the board that emergency conditions existed at the time plaintiff was in violation of the department's rules and regulations.

The appellate court also held that the evidence did not support the board's finding that plaintiff violated Rule 380.54, entitled "Conduct Toward The Public." The board found "that when issuing a traffic citation to Louis B. Sheffield, [plaintiff] failed to remain courteous and orderly, and failed to remain calm regardless of

provocation to do otherwise." The chief of police contends in his brief that the evidence presented at the hearing would fully support the board's finding. We agree.

Rule 380.54 reads as follows:

> "*CONDUCT TOWARD THE PUBLIC* Members and employees shall be courteous and orderly in their dealings with the public. They shall perform their duties quietly, avoiding harsh, violent, profane or insolent language and shall always attempt to remain calm, regardless of provocation to do otherwise. Upon request, they are required to supply their name, rank or star number in a gentlemanly manner. They shall attend to requests from the public quickly and accurately, avoiding unnecessary referral to other parts of the Department." (Emphasis in original.)

The testimony of the motorist, Sheffield, was in relevant part as follows: that plaintiff would not listen to his reason for speeding; that he told plaintiff he had a bad attitude; that plaintiff "started getting all this [*sic*] hyper, excited or agitated feeling"; and that plaintiff remarked, "I have a bad attitude?"

Plaintiff's version was different, in that he testified as follows: that he stopped Sheffield's car; that Sheffield asked why he was stopped; that plaintiff told him he would explain once Sheffield handed him his license; that after he was given the license, he told Sheffield he was speeding; that Sheffield then used vulgar language; that as he went to hand Sheffield a traffic ticket, Sheffield used his fist and batted plaintiff's hand out of the car; that plaintiff then used reasonable force to defend himself; that plaintiff was at all times calm and orderly; and that he did not use any profane language toward Sheffield.

Again, as did the conflicting evidence relative to the conditions at the time plaintiff abandoned his post, the

evidence as to whether plaintiff was courteous, orderly, and calm during the traffic stop conflicted also. The board chose to believe Sheffield, and thus, its finding that plaintiff violated Rule 380.54 was not against the manifest weight of the evidence.

The second issue presented for review is whether the appellate court erred in overturning the board's decision to discharge plaintiff. This court must determine whether the board's findings of fact supported its conclusion that cause existed for plaintiff's discharge. "Cause" has been defined as " 'some substantial shortcoming which renders [the employee's] continuance in his office or employment in some way detrimental to the discipline and efficiency of the service and something which the law and a sound public opinion recognize as a good cause for his [discharge].' " (*Walsh v. Board of Fire & Police Commissioners* (1983), 96 Ill. 2d 101, 105, quoting *Fantozzi v. Board of Fire & Police Commissioners* (1963), 27 Ill. 2d 357, 360.) The board's "cause" finding is to be respected by this court and it should be "overturned only if it is arbitrary and unreasonable or unrelated to the requirements of the service." *Walsh*, 96 Ill. 2d at 105.

The appellate court found that the board's discharge decision was not related to the requirements of the service because plaintiff's conduct did "not reflect a flaw in integrity or character" in that: he "did not deceive his superior officers," but instead told them he was leaving; he left the station when five other officers were at the desk area and a state of emergency was not in effect; he was "concern[ed] for the safety of his wife and two small children"; and he was involved in a single incident of misconduct. (211 Ill. App. 3d at 558-59.) The aforementioned points relied upon by the appellate court are not really probative of whether the board's action was

related to the needs of the service, but are more in the nature of mitigating factors.

This court stated in *Sutton v. Civil Service Comm'n* (1982), 91 Ill. 2d 404, 411:

> "The question, though, is not whether this court would decide upon a more lenient sanction than discharge were it to determine initially what discipline would be appropriate. Nor is it whether this court would conclude in view of the mitigating circumstances *** that a different penalty would be more appropriate. The question is whether, in view of the circumstances presented, this court can say that the [board], in opting for discharge, acted unreasonably or arbitrarily or selected a type of discipline unrelated to the needs of the service."

Certainly fundamental to the needs of the service is that when a police officer reports for duty, is assigned to a post, and is then refused permission to leave that post he ought to obey the order of his superior officer and remain there. See, *e.g., Martin v. Matthys* (1986), 149 Ill. App. 3d 800, 808 ("A rule permitting each officer to subjectively determine whether he believes an order to be lawful and reasonable would destroy the discipline necessarily inherent in a paramilitary organization such as the police department. [Citations.] A police officer does not have the prerogative of actively disobeying an order from a superior while seeking a determination as to the validity of that order. Such a practice would thwart the authority and respect which is the foundation of the effective and efficient operation of a police force"); 16A E. McQuillan, Municipal Corporations §45.66, at 397-98 (3d ed. 1992) ("an employee's good-faith disagreement with the employer's opinion or judgment underlying a reasonable order does not justify the employee's refusal to follow the order").

The importance of this fundamental obligation was exemplified in a passage of plaintiff's testimony:

"Q. Officer Launius, as a patrol officer, it is not your prerogative to determine whether there is or isn't available manpower to replace an officer at his assigned post, is it?

A. No, it's not.

Q. That prerogative belongs to the Chief and to his command officers, does it not?

A. Yes, it does.

Q. As a patrol officer, you were not even aware of all the information about the August 14 flood, were you?

A. No, I was not.

Q. And as a patrol officer, you [did] not know the demands upon the Department and what police officers are needed and where they were needed on August 14, did you?

A. No, I did not.

Q. And as a police officer, you did not know the strength of the force on August 14, did you?

A. No, I did not.

Q. Only the Chief of Police and his command officers knew all of those facts; isn't that correct?

A. That would be correct.

Q. And Officer Launius, you [did] not have the facts to know whether there was plenty of manpower to replace you on August 14, did you?

A. No, I did not.

Q. And as a patrol officer, it is not your position or within your power to make such a decision, is it?

A. No, it is not.

Q. Officer Launius, if every police officer on the force could decide in his own mind whether he was needed or not and whether he should stay on his post or go home, there would be a total chaos on [*sic*] the Department, would there not?

A. Yes, that's correct."

Plaintiff considers it instructive that military courts have held that an unauthorized absence can be mitigated by duress. "Duress is raised as a defense where an accused acts under a reasonably grounded fear of immedi-

ate death or serious bodily injury \*\*\* to his immediate family, if he does not commit the act." *(United States v. Palus* (1982), 13 M.J. 179, 180.) Whether plaintiff was under duress at the time he left the station is a question of fact. This court is not the finder of fact, the board was. "[A] reviewing court is not to reweigh the evidence or make an independent determination of the facts." *Murdy v. Edgar* (1984), 103 Ill. 2d 384, 391.

Assuming, *arguendo*, that the board recognized duress as a defense, it cannot seriously be contended that plaintiff was under duress for the entire period in which he was absent from his post. Before he reached his town house, the rain had stopped and the water in front of his home was no longer rising. When he did arrive at his home, the first thing he did was check on the safety of his wife and children. From there, he went to his basement where he saw that he only had "four to six inches of water." If plaintiff was under duress that morning, it had to be at an end by 11 a.m., because by this time, plaintiff had checked out his home and he had proceeded to help out his neighbors.

Furthermore, plaintiff asks this court to adopt the reasoning of the appellate court where it found that the circumstances surrounding his discharge were analogous to *Christenson v. Board of Fire & Police Commissioners* (1980), 83 Ill. App. 3d 472, and *Humbles v. Board of Fire & Police Commissioners* (1977), 53 Ill. App. 3d 731. (211 Ill. App. 3d at 558.) After reviewing these two cases, we find them to be distinguishable from the facts in the instant case.

In *Christenson*, a police officer was discharged for using a police vehicle for a two-hour period to attend to an emergency situation that confronted his horses. It appears that the appellate court reweighed the evidence and found that the police officer's conduct was not substantial misconduct justifying dismissal. The court placed

particular emphasis on the following mitigating factors: he put someone else "in charge rather than abandon his responsibilities"; he attempted to remain in contact with the department while he was gone from his post; there was no emergency that necessitated his presence in the city; and "he worked an hour after his shift to assure things ran smoothly." (*Christenson*, 83 Ill. App. 3d at 477.) Whereas in plaintiff's case, the board found: that he "abandoned" his post after "having been denied permission to leave" and did not remain "on duty until he was properly relieved by another member of the Police Department"; that he left the station and "was out of contact with the Police Department for approximately 12 hours"; that during the period of plaintiff's absence, "officers were needed to handle a major disaster in the City of Des Plaines"; and that plaintiff "left his assigned post and the Des Plaines Police Station at about 10:00 A.M., three hours after his duty shift began [and he] did not return to duty."

In *Humbles*, a police officer was discharged for disobeying a superior officer because he did not wait at the station as he was told, but instead, he left the station and traveled to the county courthouse on a personal matter which related to his wife's divorce action. The appellate court found that the police officer's conduct did not give the police board cause to discharge him. One significant reason which the appellate court relied upon was the fact that "there [was] no indication that Humbles' action had the effect of lowering police morale or undermining public confidence in the *** police department." (*Humbles*, 53 Ill. App. 3d at 735.) Conversely, the board here found that plaintiff's "conduct brought the Department into disrepute and reflected discredit upon [him], at the very time when officers were needed to handle a major disaster in the City of Des Plaines." The board also noted "[t]hat the evidence indicated that the

[plaintiff] was the sole member of the Des Plaines Police Department who while on duty abandoned his duty post, left the City of Des Plaines without permission and in defiance of an order of his superior officer" and that plaintiff "acknowledged that as a result of his conduct in abandoning his post *** during a city-wide emergency, his fellow officers can no longer rely upon him to carry out his assigned duties and to always be there when they need him."

Not only did the appellate court find the board's decision to be unrelated to the needs of the department, it also found the decision to be arbitrary and unreasonable in light of a less severe disciplinary penalty imposed upon another police officer for misconduct that arose during the same period of flooding. (211 Ill. App. 3d at 559.) Defendants contend that the other officer, Richard Czyzewski, engaged in misconduct that did not compare to the misconduct of the plaintiff. Plaintiff maintains that he and Czyzewski engaged in similar misconduct, but Czyzewski received only a four-day suspension; thus, he asks this court to find the board's decision to be arbitrary and unreasonable.

The circumstances surrounding Czyzewski's disciplinary matter were presented before the board. Czyzewski's testimony was generally as follows: on August 14, 1987, he was not scheduled to work because the 14th happened to be one of his "normal three days" off; while at home at approximately 8:50 a.m., he returned Sergeant Neil's telephone call and Neil ordered him to report to work; he told Neil that he could not get out of his driveway and that the street was impassible because it was filled with water; he lost his temper and told Neil, "F*** you. I'm not coming in"; Neil hung up and about 20 or 30 minutes later he received a message to contact the police chief; he then called the chief and the chief told him to report to his office at 9 a.m. on Monday; he

reported on Monday and a police captain advised him that the chief was recommending a five-day suspension for insubordination; he met with the chief later in the week, and the chief listened to his explanation of the incident; he told the chief that he "technically *** didn't get any water" but "was probably the only one *** for blocks around that didn't get any"; he helped a next-door neighbor because "her husband was out of town"; he also told the chief that "he had reports that the street was starting to collapse," but, as it turned out, "a large section of the parkway was actually collapsing, it wasn't the street"; and after the meeting, the chief took the matter under advisement and reduced the five-day suspension to a four-day suspension.

Chief Kozenczak testified as to the circumstances which caused him to discipline Czyzewski: Neil contacted Czyzewski, who was off duty and at home, and Neil explained the department's emergency situation; Czyzewski was unable to leave his home "because of extensive flooding in front of his house"; Czyzewski told Neil, "F*** you, I am not coming in"; he spoke to Czyzewski that morning and Czyzewski told him he was "flooded in" and that he could not get out of his house if he wanted to; he then told Czyzewski that he would see him on Monday; he suspended him for four days because of "the language that he used towards his supervisor; he did not suspend him for failing to report to work on the 14th because he determined that Czyzewski "couldn't come into work even if he wanted to"; and he did not think that he treated the plaintiff and Czyzewski unequally because he thought "[t]here [was] a big difference between the two of them"—plaintiff engaged in "direct insubordination," he was on duty, he left his post, and he walked out of the station.

An administrative tribunal's finding of "cause" for discharge may be considered arbitrary and unreasonable

when it is compared to the discipline imposed in a completely related case. *Wilson v. Board of Fire & Police Commissioners* (1990), 205 Ill. App. 3d 984, 992; see also *Basketfield v. Daniel* (1979), 71 Ill. App. 3d 877, 881 (on remand, police board should consider evidence as to discipline imposed on another member of the department who was involved in the same incident because it "would be relevant and useful to the board in exercising its discretion and insuring consistency in disciplinary action"); 2 F. Cooper, State Administrative Law 762 (1965) (administrative actions "in which the epithet *capricious* may properly be applied are those where an agency has given different treatment to two respondents in identical circumstances" (emphasis in original)).

However, cause for discharge can be found regardless of whether other employees have been disciplined differently. *Lyles v. Department of Transportation* (1989), 183 Ill. App. 3d 901, 911-12 (court did not find the discharge of an employee to be arbitrary where facts surrounding the charges of other employees precluded meaningful comparison to the discharge at issue); *Sheehan v. Board of Fire & Police Commissioners* (1987), 158 Ill. App. 3d 275, 290 n.15 ("record does not permit an informed comparison between the conduct for which plaintiff was discharged and the conduct for which other officers were merely suspended"); *Jones v. Civil Service Comm'n* (1979), 80 Ill. App. 3d 74, 75 ("plaintiff offered an unsubstantiated conclusion that criminal conduct on the part of white police officers resulted in the imposition of apparently minimal disciplinary sanctions").

In *McCaffery v. Civil Service Board of Chicago Park District* (1955), 7 Ill. App. 2d 164, a patrolman was discharged for accepting a bribe as an inducement to void an arrest. The patrolman contended that his discharge was arbitrary because the arresting officers and the sergeant in charge received only suspensions. The court re-

jected this argument, finding that "[t]he Board in determining the extent of the penalty inflicted upon the respondents had the right to take into consideration the evidence that the [patrolman] took the initiative and was primarily instrumental in working out the scheme by which the prisoners would be liberated providing certain monetary payments were made." (*McCaffery*, 7 Ill. App. 2d at 177.) After considering *McCaffery* together with the other authority outlined above, this court finds that the facts in plaintiff's case, as compared to the available facts in Czyzewski's case, are not sufficiently related to render the board's discharge decision arbitrary and unreasonable.

While it is true that Czyzewski, in a profane manner, disobeyed an order to report for duty, the chief testified that he did not discipline him for not reporting because the chief determined that the amount of water around his home would have not allowed him to "come into work even if he wanted to." On the other hand, the circumstances surrounding the misconduct of the plaintiff were different: plaintiff was at his post; he was denied permission to leave, but he left anyway, working only three hours of his shift; he was out of contact with the department for approximately a 12-hour period; and he "did not return to duty." Plaintiff did not stay at his post and carry out his duties as he was ordered to do because he thought his family was in jeopardy. However, the board noted that "[a]t no time did [plaintiff] or his wife contact the Wheeling Police or Fire Departments for assistance."

Moreover, plaintiff was not unable to return to the station after he reached his home. The record shows that after plaintiff left the station, he drove home and parked his car on the outside of his town house development. He then walked a quarter mile to his home through water which varied from chest high, to ankle high "near

\*\*\* the opening of [the] development." In his brief, plaintiff maintains that "his failure to report for more than 12 hours was due to the fact that *he was never informed* that there was an institution of 12-hour shifts, indicative of an emergency." (Emphasis added.) But, plaintiff could simply have returned to the station to complete the shift to which he was assigned. Plaintiff had checked out the safety of his family by 11 a.m., and his shift ran until 3 p.m. Had he driven the eight-mile distance from his town house back to the station, he would have been available to complete his shift and he also would have been made aware of the 12-hour shifts. Part of the reason plaintiff was not informed about the 12-hour shifts was because plaintiff did not communicate with the department until *a police officer contacted him* about a shift change. It was only after this phone call that he contacted the department at approximately 9:50 p.m. to notify the watch commander that he was available for duty. However, the plaintiff testified that *his phone* would not permit him to make outgoing calls between 11 a.m. and 5 p.m. and that he believed he was able to make outgoing calls from his phone "sometime after dark in the early evening."

Plaintiff maintains that a flash-flood warning caused him to remain at his home. Plaintiff testified that he followed the weather reports after leaving the station and that "there was a flash flood warning \*\*\* in effect for 2:00 p.m. that afternoon. More rain was expected." This warning does not compare with the obstruction which prevented Czyzewski from reporting to duty. If anything, this flash-flood warning should have induced plaintiff to return to duty.

A police officer does not have the option of performing his duties when he wishes. Plaintiff admitted that as a police officer, it was his primary and sworn duty to protect the lives and property of the citizens of Des

Plaines. The board found, *inter alia*, that plaintiff abandoned his post, that he "refused to perform his duties as a police officer," that he "demonstrated a substantial shortcoming which render[ed] continuance in employment in some way detrimental to the discipline and efficiency of the Police Department"; and consequently, the board ordered that plaintiff be discharged from his position as a police officer. This decision was neither unrelated to the needs of the service nor arbitrary and unreasonable.

For the foregoing reasons, the judgment of the appellate court is reversed, and the judgment of the circuit court of Cook County is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*