JEFFREY L. NORMAN, Plaintiff-Appellee, v. THE BOARD OF FIRE AND POLICE COMMISSIONERS OF THE CITY OF ZION *et al.*, Defendants-Appellants (Ralph G. Schaffer *et al.*, Defendants).

Second District   No. 2—92—0979

Opinion filed May 20, 1993.

Law Office of James S. Tukesbrey, of Waukegan (James Scot Tukesbrey, of counsel), and Michael J. Cummins, of Cummins & Mardoian, of Lake Forest, for appellants.

Daly & Daly, of Waukegan (Dennis P. Daly, of counsel), for appellee.

JUSTICE BOWMAN delivered the opinion of the court:

Plaintiff, Jeffrey Lee Norman, was dismissed from his job as a police officer following a hearing before defendant, the board of fire and police commissioners of the City of Zion (Board), regarding charges that he violated police department rules. Plaintiff filed a complaint for administrative review in the circuit court of Lake County against the Board and defendant Lloyd E. Detienne, Jr., the Zion police chief (chief). While the court affirmed the Board's findings that plaintiff was guilty of violating department rules, it also found that the Board erred by depriving plaintiff of a hearing in aggravation and mitigation. Accordingly, the court set aside the order terminating plaintiff and remanded the matter for such a hearing. Subsequently, the Board again ordered plaintiff's dismissal from the department.

The hearing in aggravation and mitigation was then reviewed by the court as part of the administrative review proceedings. The court reversed the dismissal order and again remanded the matter to the Board, this time with directions to order disciplinary action short of dismissal. Both the Board and the chief filed motions for reconsideration. Ultimately, the court ordered the Board to impose on plaintiff a 30-day suspension without pay, instead of discharge. The Board then filed this appeal, which was subsequently joined by Chief Detienne.

The pertinent facts underlying this case, as revealed at the Board hearings, are as follows. Plaintiff, a full-time police officer for the City of Zion, injured himself on September 21, 1989, while attempting to break up a fight between two teenagers. He described the injury as something like an electrical shock that ran down both legs and momentarily rendered him unable to walk. Shortly afterwards, plaintiff was taken to a hospital emergency room. The next day he went to see his family doctor who, in turn, referred him to Dr. Chhabria, a neurologist.

After taking a history and conducting an examination, Dr. Chhabria's impression was that plaintiff had acute lumbar, or lower back,

strain with radiculopathy, meaning an effect on the nerves as they come out of the spine. The doctor also initially ruled out a herniated disk and doubted that plaintiff had an interspinal injury. Dr. Chhabria advised plaintiff to stay off work and provided documentation to that effect for plaintiff's employer.

On subsequent visits, Dr. Chhabria performed additional tests, all of which yielded normal or only slightly abnormal results. Upon reviewing a CT scan of plaintiff, Dr. Chhabria felt that there was a disk bulging in plaintiff's lower spine and opined that such a condition would be a cause of plaintiff's pain. The doctor testified that it is usually the inflammation in the ligaments and structures around the bulging which causes the pain, rather than the bulging disk itself. Basically, Dr. Chhabria testified that he had found no indication of nerve damage, although the straight-leg-raising test did indicate nerve root irritation. The doctor prescribed traction for plaintiff.

On October 27 plaintiff indicated to Dr. Chhabria that he was getting good relief from the traction, his back movements were improving, and he was beginning to do back strengthening exercises. Dr. Chhabria advised him to return to work and prepared a certificate indicating that plaintiff could return to work without restrictions.

Upon returning to work on October 31, 1989, plaintiff resumed the same duties he had been doing before his injury and worked full time for the next 10 months. On August 24, 1990, he complained to Dr. Chhabria of back and neck pain and pain radiating down his left leg. Plaintiff indicated that he had slowed down in trying to do his duties, *i.e.*, he could not quickly get in and out of his squad car, could not run or jump to apprehend criminals, and was afraid he might endanger his fellow officers. Plaintiff made no report to the doctor of any new injury. Dr. Chhabria did not examine plaintiff but told him to stay off work for a week. Following this visit, an MRI scan was done on plaintiff which showed the bulging disk in his lower back. Dr. Chhabria again explained that the disk itself was not necessarily putting pressure on the nerve, but the pain could be caused by inflammation in the ligaments and the soft tissue. When asked whether an MRI looks at soft tissue, the witness stated that it would not see the inflammation in the ligaments.

On September 11 and November 2, plaintiff still complained of pain, and Dr. Chhabria again told him to stay off work. Although he did not examine plaintiff at this time, Dr. Chhabria talked to him about the possibility of having a myelogram performed. On redirect examination, the doctor explained that it was not necessary to test the plaintiff every time he saw him because most of the findings had

been the same ever since he had initially examined plaintiff. Dr. Chhabria ultimately told the plaintiff he could work as a police officer only if he could do a desk job or light-duty work.

While the record is not altogether clear as to dates, it appears plaintiff requested light-duty late in 1990 or early in 1991 but was denied. Chief Detienne cited the light-duty policy, which defined light-duty as work necessary to accomplish the mission of the department, and stated that the department would not create " 'makework' " light-duty for any officer. Furthermore, light-duty assignments could be denied when an officer had no reasonable expectation of returning to regular duty within 90 days. The chief testified that he could not give plaintiff light-duty because there was no such duty available at that time and plaintiff had already applied for a disability pension, thus indicating he did not believe he could be back to his regular duties within 90 days. The record reflects that plaintiff subsequently withdrew his application for a pension.

Although Dr. Chhabria characterized plaintiff's problem as "very minor at this point," he testified that he would not advise plaintiff to return to the kind of job, i.e., as a police officer, that plaintiff had explained to him. In essence, on direct examination Dr. Chhabria indicated that plaintiff could very easily reinjure his back at that particular kind of job and that, if he did so, he would have a lot more problems, there being no good cures for back problems. On cross-examination, Dr. Chhabria confirmed that his concern about plaintiff returning to work, and the reason he told plaintiff not to go to work as a police officer, was that plaintiff might reinjure himself.

The evidence deposition of Dr. Ronald Pawl was submitted to the Board by counsel for Chief Detienne. Dr. Pawl, a neurosurgeon, had seen plaintiff in October 1990 at the request of the employer's worker's compensation administrator. The doctor testified that he had treated many policemen and was aware of a police officer's duties. Dr. Pawl's medical opinion as to whether plaintiff could work as a full-time, full-duty policeman directly conflicted with that of Dr. Chhabria.

Dr. Pawl took a history from plaintiff and then examined him. Plaintiff's examination was normal. The doctor also reviewed the results of the examinations and tests that had been carried out by Dr. Chhabria. The electrodiagnostic study showed that there was no nerve damage. Neither the CT scan nor the MRI yielded findings to demonstrate any competent cause for continued complaints of pain.

In marked contrast to Dr. Chhabria's testimony, Dr. Pawl indicated that an MRI could show inflammation of ligaments. He characterized the MRI as one of the more competent tests for diagnosing

diskitis, or inflammation of the disk. According to this witness, plaintiff's MRI did not show any inflammation of any ligaments or soft tissue areas around the bulging disk in his lower back. Nor did the test reveal encroachment upon, or pinching or compression of, the nerve roots. Dr. Pawl rendered the opinion that, as of the time he saw him, plaintiff was medically capable of carrying out the activities of a police patrolman without restrictions, including running, getting in and out of an auto quickly, lifting, wrestling or subduing offenders, or climbing stairs or ladders. Finally, the witness opined that plaintiff needed no further medical or rehabilitative care.

On cross-examination counsel brought out that Dr. Pawl had seen plaintiff only once with regard to the relevant injury, that the doctor's examination of plaintiff took only about three to five minutes, and that the entire interview with plaintiff lasted somewhere between 15 and 30 minutes. Under very close questioning, the doctor explained why he could find no competent cause for plaintiff's pain. Like Dr. Chhabria, Dr. Pawl indicated that a protruding disk, in and of itself, does not result in pain. Rather, the nerve must be entrapped or pinched between a portion of the disk and the bone. This can occur when a disk herniates or ruptures, or when there is a narrowing of the spinal cord. However, none of these possible causes showed up in plaintiff's test results. Too, a pinched nerve does not function properly and an examination so demonstrates. The examinations of plaintiff reflected no improper nerve function.

In other testimony on cross-examination Dr. Pawl stated that, if plaintiff's condition had not changed since the October 1990 examination, he would not say plaintiff was a candidate for a pain clinic. This was because plaintiff's problem was neither medical nor rehabilitative in nature. However, according to the witness, there was a major socioeconomic issue involved, such an issue is a competent source for stress, "and stress is the single most common cause of complaints of neck and back pain." Dr. Pawl emphasized that the socioeconomic issue was not a medical or rehabilitative problem.

When asked if he felt plaintiff was at any greater risk of injury than anyone else because of the bulging disk in his back, Dr. Pawl responded in the negative since almost everybody has a degenerated disk of some sort. He added that people who are completely free of degenerated disks are at less risk of suffering an injury like plaintiff's than those who already have a degenerated disk because a degenerated disk is not as strong as an undegenerated disk. When asked if he would be comfortable with the risk to plaintiff by immediately putting him back on the street, Dr. Pawl said he would. The doctor added,

however, that he was not sure plaintiff was in shape to be a police officer but that, with conditioning, he would allow him to go back to work. The witness further explained that nothing medically would prevent plaintiff from working, but he would stress to plaintiff, as he stressed to all police officers, paramedics, and athletes, that "strength is their protector against troubles with disks." By conditioning, the doctor meant working out in any weight room to improve the strength in plaintiff's musculature. Dr. Pawl stated that plaintiff was not more apt to be injured because of the protruding disk. At oral argument counsel indicated that it was after the examination by Dr. Pawl that plaintiff requested light-duty work.

Dr. Pawl had put his findings in two letters to the worker's compensation administrator, dated October 18, 1990, and November 5, 1990. Copies of these letters were forwarded to Chief Detienne. The chief testified that in November 1990 the department was shorthanded and, in reliance on Dr. Pawl's conclusions, he ordered plaintiff back to work on November 19, 1990. Sergeant Ward telephoned plaintiff around 2:30 p.m. and told him to report at his regularly scheduled time of 3 p.m. Plaintiff did not report to work that day or any day thereafter up to the time of the hearing.

On December 19, 1990, based on plaintiff's failure to report to duty, the chief brought charges against plaintiff before the board of fire and police commissioners. The Board found plaintiff guilty of violating the department rules pertaining to reporting for duty and absenteeism, determined that cause for discharge existed, and ordered plaintiff removed from his position as a member of the police department of the City of Zion. Plaintiff sought administrative review of the Board's findings and decision.

At the court ordered hearing in aggravation and mitigation, testimony regarding minor incidents of improper conduct on plaintiff's part was presented. Plaintiff either contradicted the testimony or offered his explanation for the conduct. None of these incidents had resulted in a written reprimand. Following the hearing the Board again imposed a sanction of termination. When the matter was again remanded with directions to enter a lesser sanction, both the chief and the Board moved for reconsideration. In essence, these motions indicated that the parties wished to appeal the trial court order but believed they could not do so since the order did not direct the Board to impose a specific sanction. The trial court responded by directing the Board to impose upon plaintiff a 30-day suspension without pay. The court added that there was no just reason to delay the enforcement or appeal of the order. This appeal followed.

As a preliminary matter, plaintiff asserts that the notices of appeal filed by the Board and the chief should be dismissed. Noting that the Board never met and imposed the 30-day suspension without pay, as directed by the court, defendant argues that the order appealed from is not final and appealable since it did not terminate the litigation between the parties. There is no merit to plaintiff's position.

Plaintiff cites *Kvidera v. Board of Fire & Police Commissioners* (1988), 168 Ill. App. 3d 380, where the court dismissed the board's appeal. He focuses on the following language used by the court: "An order remanding the cause to the agency to impose a sanction other than the one imposed is not final and appealable because it does not terminate the litigation between the parties on the merits." (*Kvidera,* 168 Ill. App. 3d at 381.) Read out of context, this language appears to support plaintiff's position. However, the language does not refer to an order like the one at issue here. In *Kvidera* the challenged order remanded the matter to the board for imposition of " 'an appropriate lesser sanction.' " (168 Ill. App. 3d at 381.) The *Kvidera* court observed that if it were to affirm that order, the board would need to rule again on the appropriate sanction, and either party would then have the option of appealing to the circuit court once more. Thus, the litigation had not been terminated. The court concluded that, absent a contempt citation, "to have an appealable order the circuit court should either affirm or direct the board to impose a specific sanction." *Kvidera,* 168 Ill. App. 3d at 382.

In contrast to the order at issue in *Kvidera,* the order here directed the Board "to impose the sanction of a 30-day suspension without pay instead of discharge." We note that the *Kvidera* court relied on *Mitrenga v. Martin* (1982), 110 Ill. App. 3d 1006, another case where the court dismissed the board's appeal. The order in *Mitrenga* directed the board to " 'consider an alternative sanction to that of discharge.' " (*Mitrenga,* 110 Ill. App. 3d at 1007.) In determining that this order required the board to rule again on the issue of discharge, the court said: "In order to have a final and appealable order, the judgment must terminate the litigation between the parties on the merits so that if affirmed, the trial court need only execute judgment." (*Mitrenga,* 110 Ill. App. 3d at 1007.) Unlike the situation in *Mitrenga,* the trial court here directed the Board not to consider and again rule on what the sanction should be, but to impose a specific and defined sanction. Hence, neither party has the option of once more appealing to the circuit court since there is no Board action or decision to appeal. All that remains, pending affirmation by this court, is for the trial court to execute judgment. Accordingly, the or-

der appealed from terminated the litigation between the parties and is final and appealable.

■ We turn now to the merits of the case. The scope of review of an administrative agency's decision as to discharge is generally a two-step process. First, the court is to determine whether the agency's guilt finding is contrary to the manifest weight of the evidence. Second, the court must decide whether the agency's findings of fact support its conclusion that there is cause for plaintiff's discharge. (*Launius v. Board of Fire & Police Commissioners* (1992), 151 Ill. 2d 419, 435; *Walsh v. Board of Fire & Police Commissioners* (1983), 96 Ill. 2d 101, 105; *Swanson v. Board of Police Commissioners* (1990), 197 Ill. App. 3d 592, 601.) The trial court expressly ruled that the Board's guilt findings were not contrary to the manifest weight of the evidence, and plaintiff has not appealed that ruling. Consequently, the only issue to be decided is whether the Board properly concluded that there was cause to terminate plaintiff.

"Cause" has been defined as some substantial shortcoming, recognized by law and public opinion as a good reason for termination, which renders the employee's continued employment detrimental to the discipline and efficiency of the service. (*Launius*, 151 Ill. 2d at 435; *Walsh*, 96 Ill. 2d at 105; *Fantozzi v. Board of Fire & Police Commissioners* (1963), 27 Ill. 2d 357, 360.) An administrative agency's finding of cause is to be respected, and it should be overturned only if it is arbitrary and unreasonable or unrelated to the requirements of the particular service involved. (*Launius*, 151 Ill. 2d at 435; *Swanson*, 197 Ill. App. 3d at 606.) The question is not whether the court would select a more lenient sanction than discharge if it were making the initial determination, but whether the agency acted arbitrarily or unreasonably or imposed discipline unrelated to the needs of the service. *Sutton v. Civil Service Comm'n* (1982), 91 Ill. 2d 404, 411; *Swanson*, 197 Ill. App. 3d at 606.

Plaintiff was specifically found guilty of violating department rules in that he (1) failed to report for duty on November 19, 1990, after being ordered to do so, and (2) failed to report for duty any time after November 19, 1990. Ordinarily, we believe these violations would constitute cause for discharge. The chief contends, and we consider it obvious, that the need to have a police officer report for duty is fundamental to the needs of the police department. Too, in a police department the chief must command the respect and obedience of all officers in order to establish and maintain a leadership role. (*Martin v. Matthys* (1986), 149 Ill. App. 3d 800, 808.) If each officer was permitted to decide for himself whether an order was lawful and reasonable,

the discipline inherent in a paramilitary organization such as a police department would be destroyed. (*Launius,* 151 Ill. 2d at 436, citing *Martin v. Matthys* (1986), 149 Ill. App. 3d 800, 808.) Hence, the continued employment of a police officer who failed to report for duty despite an order to do so would generally be detrimental to the discipline and effectiveness of the department. We also think the law and public opinion usually recognize such conduct as a good cause for termination. If there were nothing more to this case than blatant or unfounded refusal to obey an order, it would be readily apparent at this point that the Board's finding of cause was neither arbitrary nor unrelated to the requirements of the department. However, the facts here are neither so direct nor so simple.

To begin with, the record shows that plaintiff complained to Dr. Chhabria of intermittent pain in his back and leg throughout the year following the injury. Although Dr. Chhabria considered plaintiff's problem to be minor, it is apparent from his testimony that he believed plaintiff's pain could be caused by inflammation in the ligaments and soft tissue around the protruding disk, even though, again according to Dr. Chhabria's testimony, he had no objective evidence of such inflammation. Dr. Pawl contradicted Dr. Chhabria as to objective evidence of inflammation and testified that he could find no competent medical cause for plaintiff's continuing pain. We note, however, that Dr. Pawl acknowledged that trauma can injure a disk and cause pain. More significantly, though, Dr. Pawl never testified that plaintiff could not be feeling pain. On the contrary, he specifically denied saying that. In fact, despite his testimony that he could find no cause "mechanically or on the examination" for plaintiff's pain, Dr. Pawl stated that plaintiff was likely suffering from stress, which is the leading cause of neck and back pain. In essence, Dr. Pawl acknowledged that plaintiff could be feeling the pain he described. In summary, none of the evidence showed that plaintiff could not be experiencing continuing pain.

The evidence pertinent to the presence of pain must be viewed along with plaintiff's dialogue with his physician. By the time the chief ordered him to report for duty, plaintiff had been under Dr. Chhabria's care for almost a year and had repeatedly been told he should not return to full-duty police work. According to the record, plaintiff first saw Dr. Chhabria on October 5, 1989, shortly after the injury occurred. The doctor examined plaintiff and told him how to take care of his back. It is evident that after this Dr. Chhabria became plaintiff's regular doctor, at least with regard to the injury and plaintiff's complaints of back pain. Plaintiff visited the doctor again

on October 13 and 27 and in November and December 1989. The visits continued in January, April, and July 1990, and on a monthly basis thereafter. Over this course of time, Dr. Chhabria performed tests; reviewed plaintiff's CT and MRI scans; prescribed heat, traction, and muscle relaxants; advised plaintiff to lose weight; suggested further testing; and generally followed up on plaintiff's case. It was in this context of continuing care that Dr. Chhabria told plaintiff to stay off work, starting on August 24, 1990, after plaintiff complained of continuing pain and slowing down on the job.

The chief makes much of the fact that Dr. Chhabria did not himself reexamine plaintiff before authorizing him to stay off work in August 1990. However, Dr. Chhabria had been seeing plaintiff on a regular basis, was familiar with his condition, and continued to either order specific tests or suggest to plaintiff that certain tests should be done. In any event, it is clear that, by the visit of September 20, 1990, after Dr. Chhabria had seen plaintiff's MRI scan, the message conveyed to plaintiff by his own doctor was that he should not resume his full duties as a patrolman. He was told that to do so would put him at risk of an injury which could cause him more, and more permanent, problems. Dr. Chhabria testified that he did not release plaintiff to go back to work. In fact, in October 1990 Dr. Chhabria recommended to plaintiff that he seek rehabilitation since the doctor did not anticipate plaintiff would be able to return to active police work. By the time of his November 2, 1990, visit to Dr. Chhabria, plaintiff knew the results of Dr. Pawl's examination. He discussed Dr. Pawl's recommendations with Dr. Chhabria. The doctor told plaintiff he did not agree with Dr. Pawl and again advised that plaintiff could work as an active policeman only if he did not do too much bending and lifting. Dr. Chhabria also discussed with plaintiff the results of an examination done by Dr. Levine in which Dr. Levine suggested that a myelogram and several other procedures be done for better evaluation of plaintiff's back problems.

In contrast to the active and lengthy doctor-patient relationship between plaintiff and Dr. Chhabria, plaintiff saw Dr. Pawl only once relative to the injury he sustained in September 1989. According to Dr. Pawl's own testimony, his examination of plaintiff took only about five minutes. The entire visit with plaintiff, including the examination, lasted only 15 to 30 minutes. Dr. Pawl had not yet received the results of plaintiff's MRI scan. Consequently, the doctor did not communicate his findings or any diagnosis to plaintiff at that time.

█ Collectively, the evidence is compelling that on November 19, 1990, when he was ordered to report for duty, plaintiff could have be-

lieved himself to be caught between two impossible choices. Plaintiff's own doctor, who had seen him and treated him for over a year, had told him not to return to his usual duties. Following his doctor's orders, however, possibly meant risking the loss of his job. On the other hand, the chief issued his order in reliance on Dr. Pawl's report—a report based on one five-minute examination and 30-minute maximum interview with plaintiff. Yet, following the chief's orders carried the possible risk of a permanent, disabling injury. Under these circumstances we think the Board's finding of cause to terminate plaintiff was arbitrary and unreasonable.

Although counsel attempted to pinpoint weaknesses in Dr. Chhabria's qualifications, the evidence as a whole conveys the impression that the doctor was a dedicated, capable physician. His status as a specialist in neurology undoubtedly enhanced plaintiff's perception of the doctor's knowledge and expertise. In virtually the identical circumstances, the court in *Pruitt v. Schultz* (1992), 235 Ill. App. 3d 934, 944, stated: "Dependence and reliance on [the doctor's] medical advice is therefore to be expected." The *Pruitt* court noted that in *Witherell v. Weimer* (1981), 85 Ill. 2d 146, our supreme court placed great emphasis on the doctor-patient relationship. Of this relationship the *Witherell* court observed: "There is no real doubt, of course, that the relationship between a doctor and his patient is one in which the patient normally reposes a great deal of trust and confidence in the doctor, accepting his recommendations without question." (*Witherell*, 85 Ill. 2d at 159.) While both *Pruitt* and *Witherell* are medical malpractice cases, those courts' comments on the relationship between doctor and patient are equally valid in any context. We do not consider it reasonable to punish plaintiff to the extent of terminating his employment merely because he understandably trusted in and took the advice of Dr. Chhabria that he should not resume his full police duties.

We are further convinced that a finding of cause for discharge was unreasonable in light of plaintiff's conduct after the initial hearing at which Dr. Pawl's deposition testimony was offered. During the hearing in aggravation and mitigation in April 1992, plaintiff testified without contradiction that he believed he was able to return to work. He had been following a program of diet and exercise to get himself in condition, as recommended by the doctor and physical therapist he had seen for the Zion police pension board. Although a hearsay objection was sustained when counsel asked plaintiff if his doctors had told him he could return to work, in our view plaintiff demonstrated that he had reasonably come to believe that, with conditioning, he could

return to full-time police duties. He also indicated he was making a sound effort to get into the condition which would ensure his safety in the event he was allowed to return to work. Plaintiff's post-hearing conduct reflects a good-faith desire to remain on the police force and undercuts the implication that his failure to report to duty was totally unwarranted. In this regard, we take judicial notice that when a full-time police officer is injured in the line of duty, the officer is entitled by statute (Ill. Rev. Stat. 1989, ch. 70, par. 91) (the Public Employee Disability Act) to continue to receive full salary for up to one year in relation to the same injury.

■ Based on all of the facts, we do not believe public opinion would recognize plaintiff's conduct as a good reason for termination. (See *Launius*, 151 Ill. 2d at 435.) In the circumstances in which he found himself, plaintiff's failure to report for duty did not amount to the kind of shortcoming which, if he remained as a police officer, would be detrimental to the discipline and efficiency of the service. To hold otherwise would create an atmosphere of jeopardy and great uncertainty for all those police officers who, in reliance on the expertise and direction of their physicians, do not report for duty. A situation would be created where, no matter how ill or disabled the officer was, and regardless of his doctor's advice, he would have to report when ordered to do so or risk losing his job. In our view, such a situation would be far more detrimental to the discipline and efficiency, not to mention the morale, of a police department than was plaintiff's conduct in this case. We conclude that, since the Board's finding of cause was arbitrary and unreasonable, the trial court correctly overturned it.

This case does not present a situation in which the police officer's conduct is so outrageous that he must be discharged. (See *Kloss v. Board of Fire & Police Commissioners* (1983), 96 Ill. 2d 252 (misuse of a weapon); *Carrigan v. Board of Fire & Police Commissioners* (1984), 121 Ill. App. 3d 303 (misuse of a weapon); *Sutton v. Civil Service Comm'n* (1982), 91 Ill. 2d 404 (correctional supervisor asked inmate how much it would cost to kill the warden).) Nor did plaintiff exhibit the "[f]lagrant, deliberate, and continuing disobedience" condemned in *Martin v. Matthys* (1986), 149 Ill. App. 3d 800, 808, where the officer accepted supplemental employment outside the village, even though he had been told that such work was never allowed and permission to accept such a job had been denied by the chief; he continued with the supplemental job after again being informed in writing that he could not do so; he wrote to the village manager that he intended to accept supplemental employment until the matter was set-

tled; and he had been suspended on two previous occasions for a variety of violations and improper behavior. In contrast, not only was plaintiff's conduct here not outrageous in and of itself, but plaintiff had never previously received so much as a written reprimand.

We do not perceive this case to be like *Launius v. Board of Fire & Police Commissioners* (1992), 151 Ill. 2d 419, either. The discharged officer in *Launius* was already on duty when heavy rains created flooding and an emergency situation in the city. Fearing for the safety of his family, the officer asked for and was denied permission to leave his post but left anyway. Thereafter, he neither returned to duty nor communicated with the department. He was out of contact with the department for 12 hours although the evidence showed that, after he checked on his family's safety, the threat of flood receded and he could have returned to the station in time to complete his assigned shift. At no time did plaintiff or his wife contact the police or fire department for assistance. Unlike the officer in *Launius*, plaintiff in this case had not been working for three months prior to the order to report for duty. He did not abandon a post, in violation of a direct order, during a time when he was particularly needed. And he certainly did not stay out of contact with the department during a time when he could and should have been on duty. The officer in *Launius* not only left his post in direct defiance of his orders, but he also chose not to return and not even to communicate with the department, even though there was no compelling reason to do so. Plaintiff here failed to respond to orders, not out of defiance, or even as a matter of his own willfulness, but simply because his doctor, on whom he relied for his own health and safety, advised him not to do so. In our view, *Launius* is not controlling.

Plaintiff relies heavily on *Walsh v. Board of Fire & Police Commissioners* (1983), 96 Ill. 2d 101. While we do not find it dispositive, we recognize that *Walsh* more closely resembles this case than do the authorities mentioned above. The officer in *Walsh* had misused his weapon, an offense which warranted the board's decision to discharge him. However, at the time of the offense the officer had been placed on medical-disability suspension and had been granted a pension. Although the matter was ultimately remanded for additional evidence, the court agreed in principle with the officer's argument that it was arbitrary and unreasonable to grant a medical suspension and disability pension on the basis of an officer's psychiatric problems and then discharge him and take away his pension when the psychiatric condition caused him to act in a manner that warranted discharge.

Unlike the situation in *Walsh*, there is no evidence that plaintiff in this case had been placed on medical suspension by Chief Detienne. Too, plaintiff had withdrawn his application for a disability pension. On the other hand, while it is not altogether clear whether Dr. Chhabria provided plaintiff with documentation to excuse him from work after the week of August 24, 1990, there is evidence in the record that plaintiff was on injury-related leave and receiving worker's compensation after that week. While the chief urges that plaintiff did not present evidence that he was off work in August 1990 as a result of his injury, the record is clear that Dr. Chhabria had never completely stopped treating him for that injury. Thus, the facts resemble those of *Walsh* to the extent that plaintiff's failure to report for duty was a result of the medical problems which resulted in him being on injury-related leave in the first place. *Walsh* is persuasive that we have reached the right conclusion.

For all of the reasons set forth above, the order of the circuit court of Lake County is affirmed.

Affirmed.

McLAREN and COLWELL, JJ., concur.