2022 IL App (1st) 210067-U

No. 1-21-0067

Order filed February 22, 2022.

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| ROBIN BAKER, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 19 CH 8876 |
| THE COOK COUNTY SHERIFF'S MERIT | ) | |
| BOARD, and THOMAS J. DART, Sheriff of Cook | ) | |
| County, | ) | The Honorable |
| | ) | Pamela McLean Meyerson, |
| Defendants-Appellees. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

ORDER

¶ 1    *Held*: The administrative agency's decision was not against the manifest weight of the evidence. The decision to discharge the appellant for cause was not arbitrary or unreasonable. This court affirmed the circuit court's judgment affirming the administrative agency's decision to remove the appellant from work.

¶ 2    In 2018, Thomas J. Dart, Sheriff of Cook County (Sherriff's Office), filed a disciplinary complaint against petitioner Robin D. Baker, then a Deputy Sheriff Lieutenant, for her

mishandling of an alleged rape of inmates in the holding cells behind two courtrooms in Markham. In particular, she was said to have failed to follow proper policies and procedures required of her position as the court's watch commander after the rapes occurred. Following an administrative hearing, the Cook County Sheriff's Merit Board (Board) sustained the disciplinary complaint against Baker and recommended she be discharged. Baker filed a complaint for administrative review before the circuit court, which affirmed the Board's decision. Baker now appeals arguing the Board's decision was against the manifest weight of the evidence and there was no cause for her discharge, as it was arbitrary and unreasonable. The Attorney General's Office, representing the Sheriff's Office and Board, has filed a response contesting Baker's claims on appeal. We affirm.

¶ 3                                          BACKGROUND

¶ 4       The disciplinary complaint, filed against Baker as amended on March 27, 2018, stems from an incident in which two male detainees were allegedly raped by a female detainee, who was said to have threatened both males with a bloody Aids-infected syringe so as to force sexual compliance. The Sheriff's Office alleged that Baker failed to separate the two male detainees, notify the Correctional Information and Investigations Division (Investigations Division) in charge of criminal investigations in 14 courthouses, secure the crime scene, notify any medical providers, and properly fill out her "watch commander's log." The Sheriff's Office alleged that Baker thereby neglected her duties, failed to supervise, failed to conduct herself properly, and made various admissions and false statements to investigators of the Office of Professional Review, the internal affairs unit charged with investigating complaints of officer misconduct.

¶ 5       An evidentiary hearing took place over the course of four days before a hearing officer for the Board, and the Sheriff's Office presented a number of witnesses. The evidence, consisting

of testimony from various officials and officers, as well as documents, revealed that on the day in question, May 2, 2017, Baker was working the day shift (7 a.m. to 5 p.m.). Around 1:30 p.m., Baker and several other subordinates relayed to Antwann Boyd, the Sheriff's Office Superintendent of the Markham Courthouse, that a sexual assault had occurred. Boyd, who oversaw about 100 employees, ordered Baker to secure the crime scene, ensure the relevant parties received medical attention, and notify the Investigations Division in charge of inmate-on-inmate crimes, in accordance with her job responsibilities. Between 2 p.m. and 5 p.m., Baker updated Boyd, relaying that his orders had been fulfilled, and he was "under the impression that those things were being taken care of."

¶ 6    Baker's assurances, however, rang hollow. As the afternoon wore on, Boyd learned the female detainee was still in lock-up without receiving medical attention, and the scene had not been secured. He later discovered the Investigations Division had not been notified. Instead, Baker directed her subordinate, Deputy Sheriff Gregory Hart, to take statements from the detainees and create a report, even though Hart had no specialized training for taking such witness statements involving criminal matters (while the individuals working at the Investigations Division did), and this was not one of his normal duties. Hart himself testified he understood there was a unit in the Sheriff's Office that did such things.

¶ 7    In addition, it was Sergeant George Burke (working the 3 p.m. to 11 p.m. shift), in charge of courthouse lockup and intake, who ended up ordering medical attention for the detainees. Burke testified he learned of the sexual assault from another deputy sheriff, rather than Baker, although it would have been customary for Baker to have informed him of such an incident. Specifically, he discovered the two male detainees who were in the lockup cell together with the general population had refused to get on a transport bus because they were demanding medical

attention. Around 3:30 p.m., Burke spoke to the men, both of whom informed him of the alleged sexual assault. He ordered the men from their cell, separated them, and then called Baker, stating he was sending the men to the hospital and needed staffing for help. Baker responded that the men were lying, the sexual assaults did not occur, and she would not send them to the hospital or authorize overtime for personnel. Baker was similarly dismissive about medical attention for the female detainee, stating "this is all nonsense," and ordering her to simply be transported without medical attention. Burke nonetheless ordered ambulances called. The male detainees went to the hospital around 4:40 p.m., while the female detainee spoke with paramedics who arrived on the scene about 5:30 p.m., but she declined further medical or hospital treatment. Burke's testimony as to obtaining medical attention for the detainees was corroborated by that of Deputy Sheriff Kristine Thomas.

¶ 8      The written or typed log entries and lack thereof by the relevant parties supported the above-stated facts. The record and testimony also showed that Baker had received and acknowledged reading sheriff policies 201, 321 (policy 400, effective August 2017, was the same as policy 321), 437, 809, and 903 prior to the May 2, 2017, incident at issue. Yet, according to the Sheriff's Office, Baker expressly violated these policies.

¶ 9      Her supervisor Boyd testified that watch commanders were required to complete written logs of any occurrences, activities, or roll calls. Boyd opined that Baker violated policy 201.5 related to her watch commander responsibilities by the above-stated failings. He also opined that she violated policy 437.1 insofar as she did not communicate in a manner consistent with departmental policies. He opined that she violated policy 903.2 by failing to notify investigators with training to handle alleged sexual assaults.

¶ 10    Sergeant John Vega, in charge of the Investigations Division, testified he wasn't informed of the alleged sexual assault until the morning of May 3, 2017, the day after the incident, at which point the Markham police had already collected the rape kits. Vega had merely been notified around 8 p.m. on May 2 that there was an "incident" at the Markham Courthouse. Vega testified that the situation would have been handled very differently had he been properly informed. For example, he would have immediately made courthouse staff preserve and hold the crime scene, separate the three detainees, and all three detainees would have been sent to the hospital to obtain rape kits. The appropriate investigators would have collected the rape kits so as to maintain the chain of custody in evidence. Vega would have sent an evidence technician to photograph the crime scene and collect any other physical evidence. An investigator would have performed preliminary interviews. He noted conducting interviews with sexual assault victims required specialized training due to the sensitive nature of the crime and the accused needed *Miranda* warnings before the State's Attorney would step in for a more detailed examination of the case.

¶ 11    Instead, in this case, Vega noted the interviews were not appropriately done and the crime scene was not preserved (as the cleaning staff cleared it), and there was not any evidence collected there. Vega testified that he assigned investigators to the case, and upon proper review, it showed the female, rather than the males, had been raped. This led to criminal charges being filed against the two male detainees. Vega testified that contacting the Investigations Division immediately was required by the policies in place, and such a practice was common knowledge.

¶ 12    Eyman Zabadneh, an investigator for the Sheriff's Office of Professional Review, testified that he interviewed over 40 people, including supervisors and subordinates, and reviewed over 50 documents in his investigation of this incident. An audio recording of his

interview with Baker following the incident was entered into evidence and published to the hearing officer. It revealed that, per an incident report signed by Baker, Baker had lockup staff take statements from the detainees. During the interview Baker acknowledged that she did not notify the Investigations Division, nor did she order medical attention for the detainees. A memo revealed she had not secured the scene on May 2, and there was no indication that the holding cells behind the courtroom had been searched either. Yet, during the interview Baker acknowledged that it was her responsibility to secure the scene and contact the Investigations Division. Zabadneh testified this information should have been documented in the watch logs but was not.

¶ 13    As Boyd had opined that Baker violated various policies, so too did Zabadneh. Zabadneh determined Baker violated policy 201.6, identifying a lieutenant's responsibilities, when she failed to ensure that all major incident logs were completed before her shift ended, the sergeants responded to their assignments, her subordinates were properly evaluated, guided, and instructed. She also failed to command her subordinates and make sure the units coordinated and cooperated. Baker violated policy 201.5 by failing to respond and assume command of all facility and/or unit emergencies, direct her subordinates, and coordinate department units at the scene. Baker violated policy 201.2.1 when she did not include special notices in her supervisor management log.

¶ 14    Zabadneh concluded Baker violated policy 321 and 400 by failing to properly document the incident and notify the Investigations Division. As a result, when Baker told Zabadneh that she had directed her subordinate to separate detainees and notify emergency services to take the detainees to the hospital, Baker was making false or misleading statements.

¶ 15    Zabadneh concluded Baker violated policy 903, involving the Prison Rape Elimination Act, by failing to contact the appropriate investigators for criminal allegations and failing to separate the detainees. Non-trained employees took statements from the detainees and the detainees did not receive medical attention until about four hours after the alleged rapes. Failing to contact the Investigations Division was also a violation of policy 811.

¶ 16    Following this evidence, the Sheriff's Office rested its case. Baker then testified on her own behalf as to the incident. She admitted she did not call the Investigations Division, as required, separate the male detainees (although she believed them separated), search, view or secure the area, call or directly order that the detainees receive medical attention, or speak with the detainees or deputies in lockup. Baker acknowledged the inmates should have received timely medical attention and the Investigations Division should have been contacted regardless of the believability of the inmates' allegations. Baker similarly admitted she failed to log these matters. Baker admitted she did not have confirmation on leaving for the day that the Investigations Division had been contacted, and the scene was not secured until 7:30 a.m. the following morning. Baker admitted that in hindsight, she did not do all that was required of her as to the policies and procedures. Baker acknowledged that employees were responsible for being up-to-date on the Sheriff's Office policies and procedures; she should have referred back to the policies since she did not have specific training on criminal investigations.

¶ 17    The Merit Board issued a written decision terminating Baker from her job with the Sheriff's Office, finding by a preponderance of the evidence that Baker "displayed a total lack of candor" regarding the May 2 incident, disregarded standard law enforcement practices, and did not fulfill the requirements of the Sheriff's Office by failing to supervise subordinates, contact the Investigations Division, secure the crime scene, separate the inmates, garner them medical

attention, secure evidence, and by completing an inaccurate and incomplete watch log. In short, Baker engaged in conduct unbecoming of a command rank officer. Her conduct reflected negatively on the Sheriff's Office, insofar as an "officer whose word cannot be taken on its face value, especially one who holds the rank of lieutenant, is a liability" to the Sheriff's Office, public, and the officer herself, and thus cannot be trusted. The Merit Board concluded Baker violated policy 201, 201.6, 321, 400, 437, and 903. The Board also found Baker violated Section XIII A-C and Article X, Paragraph B3 of the Rules of the Cook County Sheriff's Merit Board. Baker filed a complaint for administrative review before the circuit court, seeking reversal. The circuit court affirmed the Merit Board decision, and Baker now appeals.

¶ 18                                    ANALYSIS

¶ 19     On appeal, Baker argues she was not "wholly deficient in her duties," and did not violate a policy that would warrant her discharge. We review the administrative agency's decision regarding discharge, not the trial court's. *Rodriguez v. Weis*, 408 Ill. App. 3d 663, 668 (2011). Appellate review in this instance consists of a two-step process, the first of which is to determine whether the agency's factual findings are against the manifest weight of the evidence, *i.e.*, if the opposite conclusion is clearly evident. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008); *Kappel v. Police Board*, 220 Ill. App. 3d 580, 588 (1991). As to the second step, a reviewing court must determine if the factual findings provide a sufficient basis for the agency's conclusion that cause for discharge exists. *Kappel*, 220 Ill. App. 3d at 588-89.

¶ 20     Baker first contends the Board's decision is against the manifest weight of the evidence. A decision is contrary to the manifest weight of the evidence only when, after viewing the evidence in a light most favorable to the Board, the court determines that no rational trier of fact

could have agreed with the Board's decision. *O'Grady v. Cook County Sheriff's Merit Board,* 260 Ill. App. 3d 529, 536 (1994). Reviewing courts generally defer to an administrative agency's factual findings since they are deemed to be *prima facie* true and correct. *Williams v. Board of Review*, 395 Ill. App. 3d 337, 339 (2009). As such, the decision must be upheld where the record includes competent evidence to support it. *O'Grady,* 260 Ill. App. 3d at 536. A court of review may neither reweigh the evidence nor substitute its judgment for that of the agency. *Cinkus*, 228 Ill. 2d at 210; *O'Grady,* 260 Ill. App. 3d at 536.

¶ 21    Here, the controlling policies of the Sheriff's Office, in summary, required Baker as the watch commander, supervisor, and lieutenant on duty to respond to any major incidents, criminal activity or emergencies by taking detailed written log entries, sharing these entries with relevant parties, and directing her subordinates so as to coordinate "the operations of all department units at the scene, unless relieved by a higher-ranking supervisor \*\*\*," in a manner consistent with the department's policies, practices, and objectives. See Cook County Court Services Department Policy Manual (Policy Manual) 201.5; see also Policy Manual 201.2.1, 201.6, 437. Subject to orders from above, Baker was required to observe and ensure her subordinates handled their assignments appropriately and offer guidance and instruction where necessary. See Policy Manual 201.6. On learning of any misconduct, regardless of the source of the allegation, the policies required that the allegations be investigated in accordance with the Sheriff's Office policy. See Policy Manual 400.7.

¶ 22    In particular, the on-duty supervisor had to contact the Investigations Division "as soon as practicable," so the Investigations Division could "assume control of the incident and act as the primary investigative unit." See Policy Manual 811. Likewise, the policies required allegations of inmate-on-inmate sexual abuse to be investigated "promptly, thoroughly, and

objectively" by investigators trained in accordance with the Prison Rape Elimination Act. See Policy Manual 903. A Lieutenant was prohibited from violating any executive, general, or special orders and directives or rules and regulations of the Sheriff's Office or Board. See Cook County Merit Board Rules and Regulations, Article X, Paragraph B3. Ultimately, unsatisfactory work performance (like failure to carry out orders or delays in carrying them out), as well as false statements could lead to discipline, including termination. See Policy Manual 321, 400.

¶ 23    Here, the testimony and exhibits offered into evidence established that Baker failed to comply with the above-stated policies. While Baker was on duty as both a watch commander and lieutenant, she learned of the sexual abuse allegations among the inmates. Pursuant to these policies and also the directions of Boyd as her supervisor, Baker was required to secure the scene (which necessarily included separating the inmates), contact the Investigations Division, as it had specialized training under the Prison Rape Elimination Act, and obtain medical attention for the inmates. It is undisputed that Baker did not contact the Investigations Division, but instead ordered her subordinates with no training to interview the inmates. Baker admitted this much. Similarly, the inmates were apparently only separated for a short time and the crime scene was not properly secured before cleaning crews eliminated any potential evidence. The inmates only received medical attention by demanding it from Baker's subordinate, who served the later shift and was never informed by Baker of the pressing incident, which she failed to adequately document. In short, Baker failed to obey orders from a higher-ranking officer and failed to direct her subordinates in a disciplined manner, as well as make necessary on-the-ground observations. The sexual abuse allegations, even if fanciful, required full attention and serious handling. They did, after all, result in criminal charges against the male inmates for raping the female inmate.

¶ 24    Baker nonetheless points to her log entry and those of her subordinates in support of her claim that she adequately supervised fellow officers and handled the sexual assault. Baker's log entry states that at 1:40 p.m. on May 2, 2017, she had notified Boyd and his superior of "an alleged incident that occurred between 3 detainees" and advised her subordinate (Sergeant Lawrence Garrett) to "start paperwork on the incident." At 2:30 p.m., Baker and Boyd spoke with their superior "regarding the incident," and between 3 p.m. and 5 p.m., she "[a]dvised Sgt. Burke of status of incident," and "[c]ompleted paperwork regarding incident." Baker also points to her subordinate's log entries, which describe the alleged incident in greater detail as reported by the inmates. Notably, Hart mischaracterized the incident as an "attempted sexual assault," even though a rape had clearly been reported, and Baker reviewed this log entry testifying that she herself had not known how to characterize the incident.

¶ 25    Ultimately, these log entries support rather than detract from the conclusion that Baker had officers untrained in handling sexual assaults taking statements from the inmates, which the Sheriff's Office established was an improper practice. Baker's own entries offer little relevant detail, contrary to the policy requirements, describing only an "incident" without mention of the terms "alleged sexual assault" or rape. They also do not contradict Boyd's testimony that Baker failed to follow his orders and regular protocol. Finally, while Baker in her log entry claimed to have informed Burke of the sexual assault, Burke testified that she did not do so. The Board found Baker's log entry to be "incomplete and inaccurate" and both her statements to Zabadneh and testimony to be untruthful. Baker, for example, testified that Boyd did not direct her to call the Investigations Division or seek medical attention for the inmates. The Board ultimately credited the testimony of Burke, Boyd, Vega, and Zabadneh that Baker mishandled the incident from her supervisory position.

¶ 26    We will not reweigh the evidence or substitute our judgment for that of the Board, as that is contrary to our duty on review. *Cinkus*, 228 Ill. 2d at 210. Rather, we defer to the factual findings of the agency. *Williams*, 395 Ill. App. 3d at 339. The Board's factual findings were not against the manifest weight of the evidence.

¶ 27    Baker also argues that since the Board did not find she specifically violated policy 811 (requiring her to contact the Investigations Division), the Board was basically precluded from finding she violated policy 437 (relating to her watch commander duties of following the department's policies, practices and objectives). Baker cites no authority for this argument and, regardless, we find it nonsensical since a finding that Baker violated department policies and rules necessarily subsumes a finding that she violated policy 811, requiring her to contact the proper authorities. Thus, if the Board did not explicitly find she violated policy 811, it was certainly an implicit finding. We likewise reject Baker's contention that it was Boyd who violated policy 437, relating to watch commander duties. Boyd was not watch commander; rather, Baker was. Moreover, whether Boyd or any other subordinates failed in also fulfilling their duties was not at issue at the hearing since the charges related only to Baker and her conduct. In other words, even assuming other officers should have conducted themselves differently, that does not vitiate a finding that Baker still mishandled the sexual assault.

¶ 28    Finally, Baker challenges policy 903, requiring sexual assault allegations to be investigated in accordance with the Rape Elimination Act, as unduly vague. Baker observes that policy 903 does not expressly require inmates to be separated, for example. Baker also claims policy 611 conflicts with policy 903, since policy 611 requires written reports be assigned for follow-up investigations, while policy 903 requires sexual assault allegations be attended to by trained investigators.

¶ 29    Aside from Baker's failure to notate making these arguments before the Board, resulting in forfeiture, they have no merit. See *Nwaokocha v. Illinois Department of Financial and Professional Regulation*, 2018 IL App (1st) 162614, ¶ 66 (noting that a party on administrative review forfeits any argument not presented to the agency). The evidence shows Baker did not order the sexual assault to be investigated "promptly, thoroughly, and objectively" by investigators trained in accordance with the Prison Rape Elimination Act, and she thus violated policy 903. Any vagueness as to whether to separate the inmates is of no moment, and regardless, should be common sense to an officer in her position. And, a policy requiring a written report that a sexual assault allegation has been lodged does not conflict with an additional policy requiring that a more thorough examination of the allegations be conducted by a trained professional. In fact, policy 611, which requires follow-up investigation and also qualified detectives assigned to sexual assault investigations, is consistent with policy 903. For all these reasons, we conclude that Baker's contention that the Board's findings were against the manifest weight of the evidence must fail.

¶ 30    Baker next challenges the Board's finding that cause for discharge exists. "Cause" for discharge has been judicially defined as "some substantial shortcoming which renders the employee's continuance in office in some way detrimental to the discipline and efficiency of the service and which the law and sound public opinion recognize as good cause for [her] no longer holding the position." *Kappel*, 220 Ill. App. 3d at 589. We grant an administrative tribunal's finding of cause for discharge considerable deference and respect; such a finding will be overturned only if it's arbitrary and unreasonable or unrelated to the requirements of the service. *Rodriguez*, 408 Ill. App. 3d at 668. This is because the tribunal is in the best position to determine how an officer's conduct affects the agency's operations. See *Robbins v. Department*

*of State Police Merit Board*, 2014 IL App (4th) 130041, ¶ 39. Thus, the Board's decision will stand even if the court were to consider another sanction more appropriate. *Kappel*, 220 Ill. App. 3d at 590. The court cannot sit as a super-commission in reviewing the punishment imposed. *Id.* It is the Board, rather than the court, which is best able to determine the effect of the officer's conduct on the proper operation of the department. *Id.*

¶ 31    Baker maintains the sexual assault incident was both "unusual and fabricated," she lacked training through no fault of her own, and any shortcomings essentially were the fault of the Sheriff's Office. She argues none of her superiors was held responsible. Baker thus argues there was no cause for discharge and the Board's decision was arbitrary and unreasonable.

¶ 32    Here, the evidence established that Baker was apprised of the policies at issue. She received and acknowledged the multiple policies she was found to have violated. See *McDermott v. City of Chicago Police Board*, 2016 IL App (1st) 151979, ¶ 36 (noting, an officer's violation of even a single rule is sufficient basis for termination). As stated, she was informed by her subordinates of the sexual assault and was directed by her superiors to properly address it. The Board found she did not, as she disregarded standard law enforcement practices and was untruthful. Baker's failings were her failings alone, notwithstanding the conduct of any other party. Moreover, cause for discharge can exist even if others were disciplined differently or not at all, and this does not support a finding that the agency's decision was unreasonable. See *Launius v. Board of Fire and Police Commissioners of City of Des Plaines*, 151 Ill. 2d 419, 442 (1992); *Rodriguez*, 408 Ill. App. 3d at 668. Here, had others not intervened, undoubtedly, no criminal charges of any kind would have resulted, and an alleged rape would have gone unaddressed.

¶ 33    Misconduct of this type manifested a disrespect for the law and tended to bring discredit upon the department. See *Kappel*, 220 Ill. App. 3d at 591-92. The Board found this all constituted a failure of trust in a public office warranting discharge, and we cannot disagree. See *DeGrazio v. Civil Service Commission of City of Chicago*, 31 Ill.2d 482, 488 (1964) (noting, discharging a police officer for unbecoming conduct to the department both punishes the officer and protects the public, which must have respect for the department). Giving the Board deference, as we must, we affirm the decision to discharge Baker.

¶ 34    Finally, Baker contends the Board incorrectly determined she violated Section XIII A-C of the Rules of the Merit Board, as it was never identified in the complaint. The Attorney General concedes the complaint did not allege this rule violation. However, Baker has not pointed to anywhere in the record showing she raised this matter before the Board, which results in forfeiture. See *Nwaokocha*, 2018 IL App (1st) 162614, ¶ 66. Regardless, Baker in her opening brief has failed to request any type of relief, and she has not filed a reply brief. See Ill. S. Ct. R. 341(h)(7) (eff. October 1, 2020). As set forth, there was sufficient evidence to support the Board's finding that Baker violated a number of rules warranting her discharge, and we believe this renders her claim as to Section XIII moot.

¶ 35                                    CONCLUSION

¶ 36    For the reasons stated, we affirm the circuit court's judgment affirming the decision of the Board discharging Baker from the Sheriff's Office.

¶ 37    Affirmed.